## LORRAINE SALMON v. MONTGOMERY WARD & COMPANY.

161 N. W. (2d) 682.

September 20, 1968—No. 40,734.

*David M. Beadie, Joseph M. Finley,* and *Doherty, Rumble & Butler,* for relator.

*Gerald B. Forrette,* for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Frank T. Gallagher, JJ.

MURPHY, JUSTICE.

Certiorari to review an award of the Industrial Commission pursuant to its finding that the employee-respondent, Lorraine Salmon, sustained a temporary total disability while in the employ of employer-relator, Montgomery Ward & Company. It is contended that the finding and award are not sustained by the evidence.

It appears that the employee, Mrs. Lorraine Salmon, was 42 years of age at the time she sustained the injury for which she seeks compensation. She had three grown children. Her formal education ended after 2 years in high school. Her husband is employed as a high school principal and operates a small resort in the summer season.

From the record it appears that Mrs. Salmon had a long history of ailments, including disc surgery and unrelated surgeries in 1949 and 1952, and removal of a lump from her breast in 1962. In 1934, when she was 16, Mrs. Salmon fell downstairs in her home, injuring her back. Back pain recurred in the 1940's when she carried her three babies. One time in 1946, when she was bending over a crib, the pains in her lower back and left leg became so severe that she had to be hospitalized. Between her fall at 16 and the difficulties in the 1940's she did not have "too much" trouble with her back. After the crib incident in 1946, Mrs. Salmon had trouble "off and on" with her back until Dr. Donovan L. McCain, an orthopedic specialist, performed surgery in August 1949 to remove a ruptured disc. The operation was apparently a success and within 18 months thereafter all pain was gone and she was able to do normal housework, including lifting and carrying her children when necessary. She remained under Dr. McCain's care for three years thereafter. Before

entering employment with Montgomery Ward & Company she underwent a required physical examination by a company doctor.

Mrs. Salmon's employment with Ward's began in October 1956, and continued periodically until September 1958, when she was hired for the Christmas season as a scaler. This work involved weighing and stamping packages which ordinarily did not weigh more than 18 or 20 pounds. While at work on October 10, 1958, Mrs. Salmon reached across a table to take hold of one of the packages and, as she did so, she felt a sharp pain "from my neck down to my ankles" and "down to the lower part of my back and down into my right leg." She returned to work for a short time after lunch, but the pain forced her to stop. She reported to Dr. Webber, the employer's doctor, who gave her immediate assistance. About a week later, she was sent to Dr. Donald R. Lannin, a specialist in orthopedic surgery.

Dr. Lannin testified that Mrs. Salmon complained at that time of pain in the back and both thighs. He saw her several times between then and September 1959 when he admitted her to the Midway Hospital for a spinogram. The spinogram revealed that new disc trouble had developed in a different part of her back from that affected by the 1949 disc surgery. Dr. Lannin testified that she showed signs of "degenerative changes" at that time. He saw her on various occasions in 1960 and 1961 and said that she complained of "pain in the lower extremities on the right." In March 1963 she complained of neck as well as back difficulties and "walked with a definite stoop." He expressed the opinion that the neck pain could not have been a result of the October 1958 injury because she had not complained of pain in that area before March 1963.

Mrs. Salmon never returned to her job after the accident. From then until her March 1963 call at Dr. Lannin's office, she engaged in light housework both at her husband's summer resort and at her St. Paul home. The resort had been purchased by the husband in May 1958, prior to the accident. The resort consisted of four cabins, and Mrs. Salmon's activities there were limited to washing dishes, cooking, and some ironing. Two women were employed to do the heavier work such as bedmaking and cleaning.

When her condition seemed to worsen and she was making no im-

provement under Dr. Lannin's care, she went back to Dr. McCain, who prescribed therapy at the St. Paul Therapy Center. After seven or eight treatments which produced no substantial improvement throughout 1963 and 1964, she went to Dr. Meyer Z. Goldner, an orthopedic surgeon. Her complaints at that time were constant pain in the right hip and down the leg to the knee, neck aches, recurrent loss of control in the right hand, and weakness in the back which use of a corset did not help. She was confined to the hospital, and studies showed that she suffered from intervertebral bulging in the lower back which indicated prolapsed intervertebral discs in both the cervical and lumbar spine regions. An anterior disc excision and interbody fusion was performed by Dr. Goldner. It was his opinion that from the date of his examination until the time of the hearing on July 23, 1965, she was totally disabled from engaging in sustained gainful employment. He also thought that she should have a fusion in the future in the cervical disc area in the upper neck. He was of the view that the surgery was necessitated by the 1958 accident and that her cervical spine difficulties were also caused by the same accident. It appears that Dr. Goldner's operation was successful and that Mrs. Salmon's pains have subsided though she continues to wear a back support.

Dr. McCain's testimony generally corroborates Mrs. Salmon's testimony of her complaints. He tells of seeing her in 1946, of the operation on her back in 1949, and of her good recovery from that operation. He again saw her in 1956 and confirmed that before the accident at Ward's her back was in good condition. His opinion was that the neck trouble in 1963 could not have been related to the 1958 accident because of the time interval between the two.

The record contains widely varying views which are inconclusive, if not ambiguous, as to the degree of Mrs. Salmon's disability which might be attributed to the 1958 accident. Dr. Goldner was of the opinion that her neck, arm, and back difficulties all grew out of the 1958 accident, and estimated a permanent back disability of from 30 to 50 percent. Dr. McCain felt that he could not estimate the disability attributable to the 1958 accident. Dr. Lannin estimated that it was not over 10 percent, and neither felt that the accident was related to any injury in the cervical

area of the employee's back. Dr. Lannin seemed to think that the injury probably aggravated or accelerated a preexisting condition. He said:

"* * * The patient has a systemic degenerative condition of the fibrous tissue of the back. This is a condition which is not the result of any one accident or injury but which represents a progressive abnormality of wear as far as the patient is concerned; a condition of this type is influenced by injury and each accident and injury contributes to the wearing-out process. I feel that this patient has had a progressive wearing-out process which now has been clinically evident for almost twenty years, since her episode of 1946. I feel that the normal course is for increased wear and tear over a period of time. I feel that the accident of 1958 is one of the factors which contributed to the wearing-out process to a very limited degree."

Although the briefs and record do not mention it, it seems to us that this case should be viewed in light of the well-recognized principle that while an employer is not an insurer of the health of his employees he must take them as he finds them with all of the infirmities they bring to their employment, and he assumes the risk of having a preexisting condition aggravated by some injury which might not be harmful to a normal, healthy person. Gillette v. Harold, Inc. 257 Minn. 313, 101 N. W. (2d) 200.

After the hearing the referee concluded that the employee had been "permanently and totally disabled" up to the date of the hearing and awarded compensation for a period not to exceed 350 weeks, as provided by Minn. St. 1965, § 176.101, subd. 3(46),[1] which related to cases of permanent partial disability. On appeal, the commission found that employee had injured her lower back area as a result of the October 10, 1958, accident but that the injury to the cervical area did not result from that accident. They also found that "as a result of said personal injury of October 10, 1958, the employe has been *temporarily totally disabled* to and including the 23rd day of July, 1965, the date of hearing before the Referee, and continues to be so disabled." (Italics supplied.) Later, the

---

[1] Superseded by Minn. St. 176.101, subd. 3(45), Ex. Sess. L. 1967, c. 40, § 7.

commission amended the award "to conform with the statutory limitation of 350 weeks of temporary total disability."

We confess to having some difficulty in reviewing the award in this case because of what appears to be an ambivalent approach of the referee, the commission, and counsel who at times seem to regard the disability not as a temporary total disability under Minn. St. 1965, § 176.101, subd. 1,[2] but as a permanent partial disability under § 176.101, subd. 3(46), which comprehended that the disabled employee attempt to find work or make a reasonably diligent effort to find work. We must view the record in light of the commission's final determination that the award was made pursuant to § 176.101, subd. 1, which provided for payment of compensation:

"For injury producing temporary total disability, 66⅔ percent of the daily wage at the time of injury subject to a maximum compensation of $45 per week and a minimum compensation of $17.50 per week. This compensation shall be paid during the period of disability, but not exceeding 350 weeks, payment to be made at the intervals when the wage was payable, as nearly as may be."

Specifically, it is urged by the relator that there is no competent evidence in the record to support the finding that the employee was temporarily and totally disabled so as to warrant an award of 350 weeks' compensation. Section 176.101, subd. 1, which authorized that maximum limit of compensation for "temporary total disability," did not expressly define that term. It may be stated that that term refers to the healing period or time when by reason of the injury the claimant is unable to work. 99 C. J. S., Workmen's Compensation, § 304b. The classification of "temporary total disability" comprehends that eventually there will be either a complete recovery or an impaired bodily condition which is static. Until one or the other of these conditions is reached, the act seems to contemplate that the statutory classification is "temporary total disability." 41 Wd. & Phr. (Perm. ed.) p. 437; 2 Larson, Workmen's Compensation Law, § 57.10.

[2] Amended by Ex. Sess. L. 1967, c. 40, § 7.

It seems to us that the commission could reasonably find that during all of the 350-week period the employee was totally disabled in that she could not perform the substantial and material parts of some gainful work or occupation with reasonable continuity. Lee v. Minneapolis St. Ry. Co. 230 Minn. 315, 41 N. W. (2d) 433; Berg v. Sadler, 235 Minn. 214, 50 N. W. (2d) 266; McGuire v. Viking Tool & Die Co. 258 Minn. 336, 104 N. W. (2d) 519; Reese v. Preston Marketing Assn. 274 Minn. 150, 142 N. W. (2d) 721. From what has already been said, it is apparent that whatever services she might have been able to render were so limited in quality, quantity, or dependability that a market for them did not exist. It is not disputed that Mrs. Salmon's back trouble was either caused or severely catalyzed by the 1958 accident at Ward's. It seems to us that the commission could conclude that she was totally disabled even before Dr. Lannin saw her in a "stooped" posture in 1963. Although Dr. Lannin released her to do light work in December 1958, he admits that she complained of backache in the same interview. Her activities in connection with the light housework, performed both at her home and at her husband's summer resort, would not be inconsistent with the determination of the commission that she was temporarily totally disabled. We have repeatedly held that it is not a prerequisite that she be absolutely helpless. Berg v. Sadler, *supra*.

In view of the chronic and progressive nature of the disability and the overall medical opinion contained in the record, the Industrial Commission did the best it could to reach a fair result. There was evidence from which it might have found that the injury was total and permanent in nature and that the employee might be entitled to further compensation by way of medical and hospital expenses to correct the condition in the cervical area. We think that the award is fairly supported by the record which establishes the injury and the employee's failure to recover from the effects of that injury until the most recent surgical procedures performed by Dr. Goldner. While there may have been short intervals during the long period over which the employee suffered from this disability that she might have engaged in some light work, we do not think that that circumstance, viewed in light of the record as a whole, is sufficient to dis-

turb the determination of the Industrial Commission. Respondent is allowed $250 attorney's fees in this court.

Affirmed.