591 P.2d 143

**Kenneth E. PAULSON,**
**Claimant-Respondent,**

v.

**IDAHO FOREST INDUSTRIES, INC.,**
**Employer and Workmen's Compensation**
**Exchange, Surety, Defendants-Appel-**
**lants.**

No. 12426.

Supreme Court of Idaho.

Feb. 27, 1979.

Wynne M. Blake of Blake, Feeney & Clark, Lewiston, for defendants-appellants.

Thomas A. Mitchell, Coeur d'Alene, for claimant-respondent.

BAKES, Justice.

The issues presented by this appeal arise under Idaho's workmen's compensation law. I.C. §§ 72–101 to –929. The Industrial Commission ordered defendant appellants Idaho Forest Industries, Inc., and Workmen's Compensation Exchange to provide claimant respondent Kenneth Paulson with medical treatment for his mental condition and to pay Paulson income benefits for temporary total disability. Appellants assign error to the finding that Paulson's work related injuries caused his psychological disorder. They also contest the award of income benefits for temporary total disability, apparently disputing the commission's findings that Paulson's condition was subject to further medical treatment and was not stable and that Paulson was totally disabled. Paulson has filed a motion in this Court for attorney fees. We affirm and grant Paulson attorney fees.

Paulson sustained two lower back injuries while doing physical labor as an employee of Idaho Forest Industries. He fell and injured himself first in October of 1972 and underwent surgery a week after the mishap. He returned to Idaho Forest Industries in July of 1973 to do light work, but a few days later he fell and reinjured his back. He underwent surgery again in November of 1973.

Despite the corrective surgery, Paulson continued to have difficulties. In March and May of 1973, several months after the first operation and before his second accident, Paulson was examined by Dr. William Bozarth. In a letter dated May 4, 1973, Dr. Bozarth noted that Paulson had a history of traumatic injury with pain and numbness in his left leg and back, as well as intermittent bladder dysfunction. However, the doctor indicated that he doubted involvement of the central nervous system and suspected that Paulson might be "depressed or exhibiting findings related to psychological etiology rather than [to] a physical deficit." Dr. Bozarth wrote to Workmen's Compensation Exchange (hereinafter, the surety): "Recommendations would be to support the patient but attempt to make him aware of the possible psychological nature of his difficulties." The surety received Dr. Bozarth's letter on May 14, 1973. In December of 1974, more than a year after Paulson's second operation, Dr. Ronald Vincent, the neurosurgeon who had performed that operation, readmitted Paulson to the hospital. According to Dr. Vincent, Paulson was then in severe pain and was almost totally immobilized. In a memorandum received by the surety on December 10, 1974, Dr. Vincent wrote: "My feeling at this time is that this is primarily a hysterical manifestation, although this man very clearly has had some disabling low back difficulties."

Confronted with Paulson's injuries, operations, and his persisting maladies, the surety provided medical expenses associated with the surgery and the follow up care. It also paid temporary total disability benefits to Paulson until the summer of 1974. Those benefits were terminated when Dr. Vincent rated Paulson's disability at 20% loss of the leg at the hip. The surety did

not provide Paulson with any psychiatric evaluation or treatment. In May of 1975 Paulson's attorney specifically requested the surety to provide such care, based upon Dr. Bozarth's earlier report, but the surety declined.

Paulson ultimately did obtain a psychiatric evaluation from Dr. William Cone. In a letter dated April 20, 1976, Dr. Cone diagnosed Paulson's condition as a hysterical neurosis of the conversion type, noting that such a diagnosis did not exclude the presence of physical problems as well. He indicated that the prognosis with appropriate psychiatric treatment was questionable because the condition had existed for three and a half years. In a subsequent letter dated August 17, 1976, Dr. Cone rated Paulson's disability attributable to the hysterical neurosis at 65% of the whole man.

The extent of Paulson's disability and his readiness for a permanent disability rating were the subject of a hearing before the Industrial Commission held on August 25, 1976. Paulson himself and Dr. Cone were the only witnesses who personally appeared, although medical reports, including those from Dr. Vincent and Dr. Bozarth, were also admitted into evidence.

Paulson testified that he was forty-eight years old, had an eighth grade education, and had been a bus driver for twenty-five years before he started working for Idaho Forest Industries. He indicated that the pain in his back and left leg and his chronic headaches began with his first injury and operation and had remained relatively constant since then, although there had been periods of intensified distress and, particularly after the second operation, of short-lived improvement. Paulson said that he was taking medication to relieve his headaches and reduce his back pain and that about every two weeks the pain would be so great that he had to stay in bed for a couple of days. He indicated that his wife and son did virtually all of the chores around the family home, and he testified that he could not lift, nor could he walk, sit, or ride in a car for very long without aggravating his condition. Paulson's testimony in this regard was consistent with Dr. Vincent's written observations that Paulson "will be incapable of returning to any work similar to what he has been doing" and "will be unable to perform any tasks requiring any lifting, long standing, or sitting." Paulson acknowledged that he could perform work that did not require that he engage in any of the aggravating activities. He said that he had tried to find employment consistent with his limitations, visiting a rehabilitation training center and applying for a position as a radio operator for the sheriff's department, but without success.

Dr. Cone's letter diagnosing Paulson's condition and assessing its disabling effects were admitted into evidence as his direct testimony. On cross examination, counsel for appellants inquired primarily regarding the basis for the doctor's conclusions. The commission also examined Dr. Cone, focusing in particular upon the interplay between physiological and psychological processes in bringing about Paulson's condition.

The Industrial Commission found that Paulson suffered from a hysterical neurosis of the conversion type caused by the injuries he sustained while working at Idaho Forest Industries. The commission further found that Paulson remained totally disabled for work. However, the commission also found that Paulson's condition was subject to further medical treatment, that the full extent of his disability could not be determined until the results of such treatment were known, and that his condition was therefore not then stable and ratable for the purpose of awarding permanent disability benefits. The commission ordered appellants to provide Paulson with further reasonable medical care, including treatment for his mental condition. The commission also awarded Paulson income benefits for total disability, retroactive to the date on which the commission found that the surety had discontinued such benefits and continuing "so long as the claimant is totally disabled for work or until the results of further medical treatment became known."

Appellants contend that the commission erred in three respects. First, they attack the finding that Paulson's injuries at Idaho Forest Industries caused his hysterical neurosis. They argue that there was no competent evidence establishing such a causal link. Second, they challenge the commission's conclusion that Paulson was entitled to total temporary disability benefits from the time that the surety stopped paying those benefits (when Dr. Vincent rated Paulson's permanent partial disability) until Paulson was no longer totally disabled for work or until the results of further medical treatment were known. Appellants argue that, considering the partial disability ratings furnished by Drs. Vincent and Cone and in light of Paulson's own admission that he could perform work consistent with his limitations, the record does not support a finding of total disability. Appellants also maintain that temporary disability benefits were inappropriate after Dr. Vincent and Dr. Cone rated Paulson's disability, because the ratings established that Paulson's disabilities were permanent and that he was no longer in the period of recovery. This last argument amounts, in effect, to a claim that the commission erred in finding that Paulson's condition was still subject to medical treatment and was not stable—*i. e.,* that he might improve with psychiatric care.

■ We observe at the outset that each of appellants' three arguments—concerning respectively the cause, the extent, and the susceptibility to successful treatment of Paulson's disability—calls into question the accuracy of one of the commission's findings of fact. The scope of our review on appeal from decisions of the Industrial Commission is limited to questions of law. *Madron v. Green Giant Co.,* 94 Idaho 747, 497 P.2d 1048 (1972); Idaho Const. Art. 5, § 9. We may set aside the commission's findings of fact only if the record is devoid of substantial competent evidence to support them. *See Gradwohl v. J. R. Simplot Co.,* 96 Idaho 655, 531 P.2d 775 (1975); I.C. § 72-732(1).

## I

■ The commission's finding that Paulson's work related injuries caused his hysterical neurosis is supported by substantial competent evidence. Allowing that proof of such a causal relationship requires expert medical testimony, *see Dean v. Dravo Corp.,* 95 Idaho 558, 511 P.2d 1334 (1973), the testimony given by Dr. Cone will suffice. Appellants conceded at the hearing that the witness was a qualified psychiatrist and medical doctor. However, they maintain that Dr. Cone simply failed to express an opinion that the injuries caused the diagnosed neurosis. Dr. Cone's testimony addressed the causation issue, as the following excerpts amply demonstrate:

"Q. [By appellants' counsel] So that the extent of disability has a lot to do with the man's reaction to and tolerance to and acceptance of pain?

"A. Well, it isn't that simple. It isn't just acceptance and tolerance to pain. It is the whole personality. And the common reaction to back surgeries and this type of injury is this type of reaction that I have diagnosed.

.    .    .    .    .

"Q. [By appellants' counsel] . . . Do you think Mr. Paulson . . . was of a personality and psychological make-up that he was more susceptible to be disabled, as you described, by pain than the average person?

"A. No. . . . I don't know why he has had this type of reaction to the injury. I do not see any definite trend in his personality . . . that has caused this to happen.

.    .    .    .    .

"Q. [By the commission] . . . Does [Paulson] suffer from traumatic neurosis as far as this 65 per cent of a whole man rating is concerned?

"A. Yes, I feel there is a definite element of what you are referring to as traumatic neurosis in this case.

"Q. And the etiology of that is what, or do you know?

"A. Well, I feel that we all react to such dramatic events as having surgery. . .

"Q. Is that what you mean by 65 per cent, sir?

"A. No.

"Q. . . . [W]hat caused the 65 per cent of the whole man or disability, not physical impairment you say, but the mental problem; what caused that, what is the etiology of that?

"A. Well, it is because he has developed this dysfunction of his body and it tends to perpetuate itself after it has gone on so long. And it is a difficult thing to change and if it were—if it were something that was easily treated, I would say that, but it isn't. I don't know what else to say to you other than, you know, it is caused by his reaction to what happened and how he responded to that. It is true that some others might not respond to it, a lot do respond that way."

We think it perfectly reasonable to infer from this testimony, as the commission evidently did, that Dr. Cone believed Paulson's injuries and surgery caused his neurosis. Exact linguistic usage may be critical when a medical expert appears to base an opinion concerning cause and effect upon a mere possibility instead of a probability, *see Dean v. Dravo,* 95 Idaho 558, 511 P.2d 1334 (1973); *see also Dean v. Dravo,* 97 Idaho 158, 540 P.2d 1337 (1975), or when a requirement of medical certainty is erroneously substituted for the probability benchmark, *see Bowman v. Twin Falls Constr. Co.,* 99 Idaho 312, 581 P.2d 770 (1978). However, no special verbal formula is necessary when, as here, a doctor's testimony plainly and unequivocally conveys his conviction that events are causally related. *Cf.* E. Blair, Reference Guide to Workmen's Compensation § 19:00 (1974) (general intent and tenor of medical testimony controls; categorical statement unnecessary). The commission's finding that Paulson's injuries caused his neurosis must stand because it is supported by substantial competent evidence.

II

We next turn to appellant's claim that the Industrial Commission erred in finding that Paulson's condition was subject to further medical treatment and was therefore not stable and ratable for the purpose of making a permanent disability rating. Appellant asserts that because both Drs. Vincent and Cone had rated Paulson's disability, the commission could not properly find that Paulson's condition was susceptible to successful treatment in order to justify a temporary rather than a permanent rating.

The Industrial Commission is not bound to accept the opinion of any particular doctor that a patient's condition is stable and ratable. *See Graves v. American Smelting & Refining Co.,* 87 Idaho 451, 394 P.2d 290 (1964). Although Paulson did receive a disability rating from Drs. Vincent and Cone those ratings, taken together, do not preclude a finding by the commission in this case that Paulson's condition might be responsive to psychiatric treatment. Dr. Vincent rated Paulson's disability at 20% loss of the leg at the hip on October 26, 1974. This rating was based upon an evaluation of the patient's physiological condition. In December of 1974, upon examining Paulson in severe pain and nearly immobilized in the hospital, Dr. Vincent diagnosed Paulson's symptoms as having both a physical origin and a hysterical or psychological component as well. The commission was certainly justified in concluding that Dr. Vincent's earlier rating of Paulson's disability was not based upon a full appreciation of Paulson's condition. In August, 1976, Dr. Cone rated Paulson's disability at 65% impairment of the whole man, a rating based solely upon Paulson's hysterical neurosis. Dr. Cone's opinion was that the prognosis for recovery with appropriate psychiatric treatment was "questionable" given the passage of three and one half years without the psychiatric care that the patient should properly have received. Appellant claims that there is no evidence to support the commission's finding that Paulson's condition was subject to further medical treatment and that it was not stable and

ratable for the purpose of awarding a permanent partial disability rating.

▪ Ordinarily the claimant bears the burden of showing that he or she is still in the recovery period. *See Lawler v. Industrial Comm'n*, 24 Ariz.App. 282, 537 P.2d 1340 (1975). In this case, however, there was evidence showing that the surety had been on notice for some time that Paulson might need treatment for his mental condition; that Paulson himself did not realize that he might need such care; and that the surety had neither provided the treatment nor advised Paulson that it might be necessary. There were reports in evidence from Dr. Bozarth and from Dr. Vincent indicating that psychological processes played a significant part in Paulson's difficulties. The surety received these reports in May of 1973 and in December of 1974 respectively. Paulson indicated that he was unaware at the time of these reports that psychological treatment might be needed. When asked during cross examination whether Dr. Bozarth or Dr. Vincent had ever talked with him about what they thought was wrong with him, Paulson said only that Dr. Vincent advised him to undergo surgery and told him after the operation when his symptoms had returned that he would have to learn to live with the discomfort and should refrain from certain activities. Nothing in the record indicates that Paulson was aware before May of 1975 that psychotherapy might be appropriate. In a letter to the surety's counsel dated May 8, 1975, Paulson's attorney wrote that he had examined the letter from Dr. Bozarth which the surety's counsel had sent to him and that perhaps Paulson was suffering from a traumatic neurosis. The letter went on to request that the surety provide psychiatric evaluation and treatment. The commission specifically found that appellants had de-

nied medical treatment for Paulson's mental condition, and this finding is amply supported by the record.

▪ Under I.C. § 72–432(1),[1] an employer is required to provide for an injured employee "such reasonable medical, surgical or other attendance or treatment . . as may be *required or be requested by the employee* immediately after an injury . . . and for a reasonable time thereafter." (Emphasis added.) The language of I.C. § 72–432 is mandatory; it *requires* the employer to provide his injured employee medical care as needed or requested within a reasonable time after an occupational injury. Here, the surety had knowledge of an employee's medical condition which required treatment, while the employee was not even aware of the condition. Upon learning that there may be a psychological component to the injury Paulson, through his attorney, requested psychiatric treatment in May, 1975. Under these circumstances the commission was certainly justified in giving the claimant Paulson the benefit of any possibility, however slender, that his condition would improve with treatment. Inherent in Dr. Cone's diagnosis. that psychiatric treatment would be of "questionable" value to Paulson was the implication that there was some chance Paulson would improve with the proper treatment. When a doctor has expressly or impliedly suggested a method of treating an injured employee to the employer or surety and the treatment has not been furnished, and when the employee was unaware that the treatment might be beneficial and the employer or surety did not so inform the employee within a reasonable time, we think it appropriate for the commission to presume that the treatment did offer and continues to offer a prospect for improving the injured employee's condition.

---

1. I.C. § 72–432(1) in effect at the time of the accidents and at the time of the commission's hearing read:

"72–432. Medical services, appliances and supplies.—(1) The employer shall provide for an injured employee such reasonable medical, surgical or other attendance or treatment, nurse and hospital service, medicines, crutches and apparatus, as may be required or be requested by the employee immediately after an injury or disability from an occupational disease, and for a reasonable time thereafter. If the employer fails to provide the same, the injured employee may do so at the expense of the employer."

We therefore affirm the commission's finding that Paulson's condition was treatable and that he was entitled to temporary total disability benefits and continued medical benefits from the surety.

### III

We next consider appellants' contention that the commission erred in finding that Paulson was totally disabled for work. Appellants maintain that the finding cannot be reconciled with the partial disability ratings furnished by Dr. Vincent and Dr. Cone or with Paulson's own admission that he could perform work consistent with his limitations.

The medical ratings of Paulson's condition do not conflict with the commission's finding that Paulson was totally disabled for work. Although medical impairment ratings may be dispositive when a claimant's infirmity is limited to a sched- uled loss for which the legislature has prescribed income benefits, *see* I.C. § 72–428, Paulson's hysterical neurosis is not such a loss. Generally, a permanent disability rating "is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by nonmedical factors, such as age, sex, education, economic and social environment, training and usable skills." I.C. § 72–425.[2] Disability, whether temporary or permanent, involves a "decrease in wage-earning capacity," I.C. § 72–408(3),[3] or a reduction in the "ability to engage in gainful activity," I.C. § 72–423.[4] *See Crawford v. Neilson,* 78 Idaho 526, 307 P.2d 229 (1957). Permanent impairment, defined in part as an "anotomic or functional abnormality or loss," "is a contributing factor to, but not necessarily an indication of the entire extent of permanent disability." I.C. § 72–422.[5] Temporary impairment would

2. I.C. § 72–425 provides:
   "72–425. Permanent disability evaluation.— 'Evaluation (rating) of permanent disability' is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by nonmedical factors, such as age, sex, education, economic and social environment, training and usable skills."

3. I.C. § 72–408 provides:
   "72–408. Income benefits for total and partial disability.—Income benefits for total and partial disability during the period of recovery shall be paid to the disabled employee subject to deduction on account of waiting period and subject to the maximum and minimum limits set forth in section 72–409, Idaho Code, as follows:
   "(1) Total disability for employee without dependent children. To an employee without dependent children, but not to exceed a period of fifty-two (52) weeks, an amount equal to sixty per cent (60%) of his average weekly wage and thereafter an amount equal to sixty per cent (60%) of the current applicable average weekly state wage.
   "(2) Total disability for employee with dependent children. To an employee with dependent children, in addition to the amounts fixed in subsection (1) herein, an amount equal to seven per cent (7%) of the currently applicable average weekly state wage for each dependent child to and including a maximum of five (5). In case of an employee who is receiving a minimum weekly benefit, the allowance for dependent children shall be added to such minimum benefit subject to the overall maximum of ninety per cent (90%) of average weekly wage as provided in section 72–409, Idaho Code.
   "(3) Partial disability. For partial disability during the period of recovery an amount equal to sixty per cent (60%) of his decrease in wage-earning capacity, but in no event to exceed the income benefits payable for total disability."
   Though the reference to wage-earning capacity is found only in subsection (3), which deals with benefits for partial disability, we think that total disability during the recovery period is also based upon wage-earning capacity, or rather upon the complete absence of it.

4. I.C. § 72–423 provides:
   "72–423. Permanent disability.—'Permanent disability' or 'under a permanent disability' results when the actual or presumed ability to engage in gainful activity is reduced or absent because of permanent impairment and no fundamental or marked change in the future can be reasonably expected."

5. I.C. § 72–422 provides:
   "72–422. Permanent impairment.—'Permanent impairment' is any anatomic or functional abnormality or loss after maximal medical rehabilitation has been achieved and which abnormality or loss, medically, is considered stable or nonprogressive at the time of evaluation. Permanent impairment is a

likewise be a factor but not necessarily the controlling consideration in determining the extent of a person's temporary disability. See note 5, *supra*. We recently upheld a disability finding of fifty percent, though medical experts put the physical impairment at only thirty-five to fifty percent as compared to the loss of the leg at the hip. *Murray v. Hecla Mining Co.*, 98 Idaho 688, 571 P.2d 334 (1977). Decisions elsewhere are in agreement. *See, e. g., Tropicana Pools, Inc. v. Truex*, 287 So.2d 71 (Fla.1973) (finding of 5 percent disability based on claimant's subjective complaints of pain upheld despite contrary medical testimony); *N. G. Gilbert Corp. v. Russell*, 451 S.W.2d 613 (Ky.1970) (finding of total disability to work as tree trimmer upheld despite medical testimony that physical impairment did not exceed five percent of body as a whole). Thus, the mere fact that Dr. Vincent rated Paulson at twenty percent loss of the leg at the hip and that Dr. Cone rated him at sixty-five percent impairment of the whole man did not prevent the commission from finding that Paulson was totally disabled.

■ Total disability connotes an inability to sell one's service in a competitive labor market. *See Lyons v. Industrial Special Indemn. Fund*, 98 Idaho 403, 565 P.2d 1360 (1977). "It is not necessary for a person to be physically unable to do anything worthy of compensation to be classified as totally disabled." *Id.* at 406, 565 P.2d at 1363. "An employee who is so injured that he can perform no services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist, may well be classified as totally disabled." *Arnold v. Splendid Bakery*, 88 Idaho 455, 463, 401 P.2d 271, 276 (1965). As indicated above, appropriate considerations include both medical and nonmedical factors, such as age, sex, education, training, usable skills, and the economic and social environment. *See* I.C. § 72–425.

■ Under the foregoing standard, the medical testimony and Paulson's own testimony provide substantial evidence to support the commission's finding of total disability. Dr. Vincent's written observations, which were admitted in evidence, state that Paulson was "incapable of returning to any work similar to what he had been doing" and that he would be "unable to perform any tasks requiring any lifting, long standing or sitting." Paulson testified that he could not lift and could not walk, stand, sit, or ride in a car for very long without aggravating his condition. He indicated that he suffered from pain in his back and left leg, as well as chronic headaches, and that about every two weeks the pain would become so intense that he would have to stay in bed for a couple of days. He indicated that his wife and son performed virtually all of the chores around the family home and said that he had not worked since his second injury, although he had applied without success for a position at the sheriff's department that he thought would have been consistent with his limitations. Though Paulson acknowledged that he thought he could perform work that did not require him to do any of the things that aggravated his condition, this does not preclude a finding of total disability. *See Salmon v. Montgomery Ward & Co.*, 281 Minn. 406, 161 N.W.2d 682 (1968) (performance of light housework not inconsistent with finding of temporary total disability); *Vader v. State Indus. Accident Comm'n*, 163 Or. 492, 98 P.2d 714 (1940) (temporary total disability benefits proper where claimant performing light exercise and work prescribed by physician). Viewing all of the evidence before it, the commission could properly find that any services Paulson could perform would be so limited in quality, quantity, or dependability that a reasonably stable market for them did not exist. *Cf. Skokie Valley Asphalt Co. v. Industrial Comm'n*, 45 Ill.2d 333, 259 N.E.2d 66 (1970) (claimant's testimony that he was still experiencing constant pain following back surgery and could not find

basic consideration in the evaluation of permanent disability, and is a contributing factor to, but not necessarily an indication of, the entire extent of permanent disability."

employment was sufficient to sustain finding of permanent total disability); *Walker v. Porter Prod. Finishers, Div. Porter Paint Co.*, 505 S.W.2d 178 (Ky.1974) (ability to perform menial work for three or four hours per day did not preclude finding of total disability); *Montgomery v. Delta Concrete Prods. Co.*, 290 So.2d 769 (La.Ct.App. 1974) (testimony that claimant suffered from intense pain in back and left leg following surgery supported finding that claimant was unable to perform duties of employment without significant pain and was therefore totally disabled). The finding of total disability is supported by substantial competent evidence and therefore cannot be set aside.

## CONCLUSION

The commission's findings that Paulson's injuries caused his hysterical neurosis, that he was totally disabled for work, and that his condition was subject to further medical treatment and was not stable and ratable are affirmed.

Claimant Paulson has filed a motion for attorney fees with this Court. Paulson is entitled to costs and attorney fees pursuant to I.C. § 72–804.[6] *See* I.A.R. 4.

Affirmed. Costs and attorney fees to respondent.

McFADDEN, DONALDSON and BIST-LINE, JJ., concur.

SHEPARD, Chief Justice, dissenting.

I disagree with and dissent from that portion of the majority opinion contained in Part II. It is my view that when Paulson, his employer and the surety appeared before the Industrial Commission they intended to obtain a permanent disability rating ascertainment. However, the Commission, on its own motion, determined to keep the claim open on what I feel is a dubious finding that the claimant's condition was not stable. The majority opinion, on what I believe are equally dubious grounds, sustains that action of the Commission.

Part II of the majority's opinion is premised on the assumption that (1) Paulson's psychological problem was treatable, and (2) the surety and employer breached a duty to provide treatment.

Among the testimony cited by the majority opinion on the treatability issue, Dr. Cone stated, "And it [Paulson's dysfunction] is a difficult thing to change and if it were—if it were something that was easily treated, I would say that, but it isn't." Cone also noted, "The prognosis with appropriate psychiatric treatment is questionable because his condition has existed for three and one-half years." In my view the record provides no other evidence relating to treatability.

The claimant has the burden of showing that his condition was not stationary. *Lawler v. Industrial Commission*, 24 Ariz. App. 282, 537 P.2d 1340 (1975); *Timmons v. Industrial Commission*, 83 Ariz. 74, 316 P.2d 935 (1957). Paulson presented no evidence supporting a claim that his condition was not stable. In my view, the majority is willing to obtain a negative inference from the word "questionable" and transform it into substantive evidence. A "chance" or "slender possibility" thereby becomes sufficient medical evidence to support a finding of the Commission. It has been my understanding that the law of Idaho is to the contrary. "In order to recover in Workmen's Compensation cases, there must be medical testimony supporting the claim for compensation with a reasonable degree of

---

6. "72–804. Attorney's fees—Punitive costs in certain cases.—If the commission or any court before whom any proceedings are brought under this law determines that the employer or his surety contested a claim for compensation made by an injured employee or dependent of a deceased employee without reasonable ground, or that an employer or his surety neglected or refused within a reasonable time after receipt of a written claim for compensation to pay to the injured employee or his dependents the compensation provided by law, or without reasonable grounds discontinued payment of compensation as provided by law justly due and owing to the employee or his dependents, the employer shall pay reasonable attorney fees in addition to the compensation provided by this law. In all such cases the fees of attorneys employed by injured employees or their dependents shall be fixed by the commission.

medical probability." *Dean v. Dravo Corp.,* 95 Idaho 558, 560, 511 P.2d 1334, 1336 (1973), and the cases cited therein. A medical probability exists when there is more evidence in favor of a proposition than against it. *Id.* The evidence before the Commission demonstrates by a medical probability that Paulson's dysfunction was *not* treatable and, accordingly, I would set that portion of the findings of the Commission aside.

I believe it a fair inference that the majority is willing to lower the standard of medical proof to which a claimant is held because they perceive a breach of duty to provide medical treatment. An employer is required to provide medical treatment to an injured employee under the circumstances detailed in I.C. § 72–432(1). The employer has a statutory duty to provide such treatment "as may be required or be requested by the employee immediately after an injury or disability from an occupational disease, and for a reasonable time thereafter." The statute appears to contemplate two circumstances: (1) where an emergency exists and time dictates that treatment be given without regard to notice or treatment, and (2) where an employee makes a reasonable request for treatment of his or her work related injury.

In my judgment, it is clear that Paulson had no need for emergency psychiatric treatment. I believe the question then becomes whether the employer and surety denied treatment which had been reasonably requested by the employee. The majority here, however, faults the employer and the surety only because they allegedly had *notice* of a potential psychological overlay. I find no foundation in the statute for that analysis and it faults an employer for failure to do that which he had no power to do. "Once an employee has been placed under the care of a competent physician, surgeon or hospital, neither the employer nor the insurance carrier have the power or authority to order or direct what treatment or method of treatment the employee shall receive." 10 Schneider, Workmen's Compensation Text, § 2017. The fact that an employer and surety may have received medical reports mentioning the possibility of a psychiatric problem is not controlling since there must be a *request* for treatment before there can be a breach of a duty to provide treatment. *See Lane v. General Tele. Co. of Northwest,* 85 Idaho 111, 376 P.2d 198 (1962).

Paulson's attorney ultimately did present a request to provide psychiatric care in May of 1975. Thus, I deem May 1975 was the earliest date that any breach of a statutory duty could have occurred since all requested and required care up until that time had been provided. In determining whether or not reasonable medical and psychiatric treatment had been denied following May 1975, consideration must be given to the diagnosis made and the treatment given. *Burch v. Potlatch Forests, Inc.,* 82 Idaho 323, 353 P.2d 1076 (1960); *Johnston v. A. C. White Lumber Co.,* 37 Idaho 617, 217 P. 979 (1923). The record reveals that no doctor undertook the treatment of Paulson's psychiatric problem and the apparent reason is that by the time it was diagnosed, it was too late for treatment. It is also significant to note that after the request for treatment was denied, Paulson did not then seek psychiatric treatment at his own expense. If he had so obtained psychiatric treatment and demonstrated the reasonableness thereof, I.C. § 72–432(1) would have permitted reimbursement therefor. It is clear to me, based on all of the above, that the surety acted reasonably in denying requested treatment.

In sum, I believe the evidence is entirely inadequate to support the finding of the Commission that Paulson's condition is treatable. Further, there is no statutory basis for a finding by this Court that the surety or employer breached a duty to provide treatment. Had the Commission ruled that Paulson was entitled to total permanent disability, I would not quarrel, but here, however, they have made their findings as to treatability without sufficient evidentiary foundation and this Court has found a breach of a duty to provide treatment when no such duty statutorily exists.