645 P.2d 334

**William A. GORDON,
Claimant-Appellant,**

v.

**W. C. WEST, Employer; and Industrial Indemnity Co., Surety,**

**and**

**State of Idaho, Industrial Special Indemnity Fund, Defendant-Respondents.**

No. 13425.

Supreme Court of Idaho.

May 6, 1982.

Nicholas M. Lamanna, Priest River, for claimant-appellant.

Samuel Eismann, Thomas A. Mitchell, Coeur d'Alene, for defendants-respondents.

BAKES, Chief Justice.

This appeal is from an order of the Idaho Industrial Commission declaring that claimant, William A. Gordon, was only partially permanently disabled as a result of an in-dustrial accident and denying recovery from the Industrial Special Indemnity Fund.

The record discloses that claimant appellant is 57 years old and lives in Sandpoint, Idaho. He has the equivalent of a high school education and has been employed as a lumber truck driver since approximately 1946. On January 8, 1976, the date of the accident involved in this case, claimant was employed by W. C. West, the defendant employer.

Gordon has an extended history of work related injuries. In about 1953, Gordon's foot was twisted when he was securing a load of lumber on his truck. This accident led to the fusion of his right ankle and left him permanently and partially impaired to an extent of 12% of the whole man. Additionally, lightning struck Mr. Gordon in about 1973 while he was changing a tire on his truck. Gordon testified that the lightning strike caused some injury to a toe on his right foot and some soreness to develop in his neck. Claimant further testified as to other minor work related injuries, including an altercation with a fellow employee in which he injured his neck and shoulder, smashing a finger in a tailgate, and falling from a lumber trailer and spraining his wrists. After each of these injuries, claimant returned to his employment.

On January 8, 1977, claimant was loading bundled lumber upon his truck. The Industrial Commission found that while claimant was prying with a large board against a bundle, the board broke, and claimant fell forward into the load, striking his head as he fell. Gordon finished loading the truck but suffered pain in his neck, left arm, and between his shoulder blades.

The claimant subsequently sought medical treatment from his family physician, who referred him to Dr. Lynch, a neurosurgeon in Spokane, Washington. Claimant was examined by Dr. Lynch on January 26, 1977, and hospitalized for an injury to the seventh nerve in his neck. Examination disclosed a bone spur, or osteophyte, which had been present for several years; Dr. Lynch, however, testified that he thought

the osteophyte to be asymptomatic until the 1977 accident. Dr. Lynch removed the osteophyte to relieve compression of the seventh cervical nerve root.

Dr. Lynch treated the claimant until July 20, 1977, when the nerve pain related to the osteophyte was believed to have been relieved. Dr. Lynch testified concerning his earlier written report that claimant's shoulder problem could be corrected and that he probably would be able to return to gainful employment. Claimant, however, continued to complain of pain in his left arm and shoulder, which Dr. Lynch believed to be caused by capsulitis, an inflammation of the joint related to claimant's cervical nerve root injury. Dr. Lynch suggested that claimant see an orthopedic surgeon for further treatment.

Dr. Blaisdell, an orthopedic surgeon, examined Mr. Gordon in June and July of 1977, giving injections for the pain in his shoulder on two occasions. Although claimant underwent no further treatment for the condition related to the 1977 accident, Dr. Blaisdell examined claimant on December 24, 1977, and subsequently rated his permanent physical impairment relating to this injury at 15% of the whole man, with 10% apportioned to the neck and cervical problem and 5% to the left shoulder. Dr. Blaisdell testified that this 15% impairment figure related only to limitations on claimant's range of motion.

Claimant filed an application for hearing before the Industrial Commission and a motion to join the Idaho Special Indemnity Fund (Fund) on January 30, 1978. At the hearing held on November 6, 1978, claimant testified of continuing pain in his neck, left shoulder and between his shoulder blades, lack of sleep, inability to lift heavy objects above the waist, and that his arms became numb while driving. At the conclusion of

the hearing, the commission found that Mr. Gordon had a total temporary disability from January 14, 1977, until December 24, 1977, and that thereafter he had permanent partial disability resulting from the January 8, 1977, accident which amounted to 15% of the whole man. Claimant was awarded income benefits against defendant Industrial Indemnity Company.[1] The commission found that since claimant was not totally and permanently disabled, no recovery from the Idaho Special Indemnity Fund could be obtained and dismissed the Fund. After the commission denied claimant's motion for reconsideration, claimant filed notice of appeal alleging as error the commission's failure to find that claimant is totally and permanently disabled.

The claimant in a workman's compensation case has the burden of proving that he has suffered a compensable injury in the course of his employment. *Dean v. Dravo Corp.*, 95 Idaho 558, 511 P.2d 1334 (1973); *Davenport v. Big Tom Breeder Farms, Inc.*, 85 Idaho 604, 382 P.2d 762 (1963). As to his total temporary disability, Gordon met this burden, and the Industrial Commission found that the fall from his truck in January of 1977 caused the osteophyte in his neck to become symptomatic, necessitating surgery. In its finding of fact number 10, the commission found that claimant was totally disabled from January 14, 1977, the date he ceased work, until December 24, 1977, at which time he had reached a permanent and stable condition. The crucial issue on appeal in this case is whether there was substantial competent evidence to sustain the commission's finding that after December 24, 1977, claimant's permanent disability caused by the 1977 accident did not exceed his permanent impairment rating of 15% of the whole man.[2]

1. The commission awarded Gordon income benefits of $161.56 per week for a period of 49 weeks, the time which he was found to be totally disabled. The commission also found that Gordon was entitled to income benefits of $90.75 per week for a period of 75 weeks, a total of $6,806.25 for the permanent partial disability suffered by him.

2. A permanent impairment evaluation is "a medical appraisal of the nature and extent of the injury or disease as it affects an injured employee's personal efficiency in the activities of daily living, such as self care, communication, normal living postures, ambulation, elevation, travelling, and nonspecialized activities of bodily members." I.C. § 72–424.

Our review of Industrial Commission findings of fact is limited in scope by Idaho Const. art. 5, § 9, and I.C. §§ 72–724, and –732. "This Court only has authority to reverse a decision of the commission when its findings are unsupported by 'any substantial competent evidence,' I.C. § 72–732 (1), or are not supportable as a matter of law, Idaho Const. art. 5, § 9." *Curtis v. Shoshone County Sheriff's Office*, 102 Idaho 300, 303, 629 P.2d 696, 699 (1981); *Sykes v. C. P. Claire & Co.*, 100 Idaho 761, 605 P.2d 939 (1980); *Paulson v. Idaho Forest Industries, Inc.*, 99 Idaho 896, 591 P.2d 143 (1979). The commission had before it evidence of Mr. Gordon's age, skills, training, education, his testimony, and the testimony of two treating doctors.

In addition to the testimony set out above in the statement of facts, the following evidence was before the commission. On cross examination, Mr. Gordon stated that he had experienced some pain in his neck, particularly when lifting, ever since he was struck by lightning in 1973. He denied experiencing pain in his shoulder or arm prior to the 1977 accident. Dr. Lynch testified that the surgery performed to remove the osteophyte was successful and that his earlier written report indicated that claimant was free of pain in his shoulder and arm at the termination of hospitalization. Dr. Lynch felt that the capsulitis, the source of Mr. Gordon's continuing pain, was related to his cervical nerve root injury. His testimony further indicated that if capsulitis is diagnosed early and treated appropriately it would last, at the most, possibly six months. Finally, Dr. Lynch stated that a condition which had caused claimant trouble and some pain at night, thoracic outlet syndrome, was not connected to the 1977 injury and had subsequently been resolved. ▆▆▆ Dr. Blaisdell, the orthopedic surgeon who treated claimant after Dr.

Lynch's treatment was completed, testified that Mr. Gordon received no treatment other than the two injections for shoulder pain, but that Dr. Blaisdell had examined him in October, 1977, for purposes of a progress report to the insurance company. Dr. Blaisdell testified that in October, 1977, claimant's shoulder was not significantly symptomatic, and the pinched nerve in claimant's neck had responded quite well to treatment. The weight to be given evidence is a question for the Industrial Commission, *Murray v. Hecla Mining Co.*, 98 Idaho 688, 571 P.2d 334 (1977), and the extent of an injured worker's disability for work is a factual matter committed to the particular expertise of the Industrial Commission. *Thom v. Callahan*, 97 Idaho 151, 540 P.2d 1330 (1975); *Bottoms v. Pioneer Irr. Dist.*, 95 Idaho 487, 511 P.2d 304 (1973). The findings of the commission that Mr. Gordon's permanent disability rating amounted to 15% of the whole man is supported by substantial and competent medical and non-medical evidence, as reviewed above, contained in the record.

▆▆▆ On appeal, Gordon maintains that he established a *prima facie* case that he falls within the "odd lot" category of workers, and that because of his odd lot status the commission erred in failing to shift the burden of proof regarding the degree of disability to the defendants. An odd lot worker is an employee who is so injured that he can "perform no services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist." *Reifsteck v. Lantern Motel & Cafe*, 101 Idaho 699, 700, 619 P.2d 1152, 1153 (1980), citing *Arnold v. Splendid Bakery*, 88 Idaho 455, 463, 401 P.2d 271, 276 (1965); *Lyons v. Industrial Special Indemnity Fund*, 98 Idaho 403, 565 P.2d 1360 (1977); *see* 2 Larson, The Law of Workmen's Compensation,

---

Evaluation of a permanent disability is distinguishable in that such an evaluation is "an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factors of permanent impairment and by nonmedical factors, such as age, sex, education, economic and social environment, training and usable skills." I.C. § 72–425.

"Permanent impairment is a basic consideration in the evaluation of permanent disability, and is a contributing factor to, but not necessarily an indication of, the entire extent of permanent disability." I.C. § 72–422.

§ 57.51 (1976). A claimant must establish a *prima facie* case that he is in the odd lot category. *See Chrysler Corp. v. Duff*, 314 A.2d 915 (Del.1973). If the evidence of both medical and non-medical factors places a claimant *prima facie* in the odd lot category, the employer has the burden to show that some kind of suitable work is regularly and continuously available to the claimant. *See Lyons v. Industrial Special Indemnity Fund, supra*, and authorities cited therein.

■ Whether a claimant falls within the odd lot category is a factual determination to be made by the Industrial Commission. *Reifsteck v. Lantern Motel & Cafe*, 101 Idaho 699, 619 P.2d 1152 (1980); *Gradwohl v. J. R. Simplot Co.*, 96 Idaho 655, 531 P.2d 775 (1975). The record contains testimony of Mr. Gordon that he had attempted to work as a truck driver several times since his accident, but that his neck hurt and his arms numbed, hindering his ability to "keep up" with the other gypo drivers. He testified that, at the time of the hearing, he suffered from pain in his neck and left shoulder, in between his shoulder blades, most of the time, stating that he suffered the most pain when he lifted something heavy above the waist. Testimony of Dr. Lynch was that the operation relieving the osteophyte was, to a great extent, successful. He testified as to a report of June 13, 1977, not contained in the record, which indicated that Gordon probably would be able to return to gainful employment when his capsulitis ended. Dr. Blaisdell indicated that he told plaintiff that there was nothing that could be done to make him employable; however, this statement referred to claimant's inability to pass the Interstate Commerce Commission test, in relation to truck driving activities.[3]

■ While the commission reviewed the evidence and found that Gordon was not then capable of performing the physical activities required for driving a truck, the evidence does not establish as a matter of law that Gordon was probably unemployable in any occupation, as was the situation in *Lyons, supra*. The burden of proving availability of regular employment within the claimant's capabilities shifts to the employer only when the claimant makes a *prima facie* case that he is in the odd lot category. *See Reifsteck v. Lantern Motel & Cafe*, 101 Idaho 699, 619 P.2d 1152 (1980); *Lyons v. Industrial Special Indemnity Fund*, 98 Idaho 403, 565 P.2d 1360 (1977); *Francis v. Amalgamated Sugar Co.*, 98 Idaho 407, 565 P.2d 1364 (1977). Therefore, it remained the burden of Mr. Gordon to prove the unavailability of suitable work in attempting to establish his alleged total disability. *See Chrysler Corp. v. Duff*, 314 A.2d 915 (Del.1973); *Clark v. Western Knapp Engineering Co.*, 190 So.2d 334 (Fla. 1966); 2 Larson, The Law of Workmen's Compensation, § 57.61 (1976). *Accord, Reifsteck v. Lantern Motel & Cafe*, 101 Idaho 699, 619 P.2d 1152 (1980).

■ Mr. Gordon's employment history indicates that his efforts to obtain employment after his January, 1977, accident were directed toward truck driving.[4] Although the pain he suffered while attempting to drive truck caused him to cease his efforts, the record does not disclose that Gordon attempted to obtain or was denied any other suitable employment which he might be capable of performing. A claimant must do more than assert that he cannot perform his

3. Dr. Blaisdell testified as follows:
 "Q. And what was the result, what opinions or knowledge did you gain by this examination of October 11, '77?
 "A. First of all, his right ankle was not preventing him from returning to work as a truck driver. However, his shoulder, namely the left shoulder at that time was not significantly symptomatic and a pinched nerve in the neck had responded quite well to treatment. The patient told me he could work at that time if he could pass the exams. But said he could not pass the Interstate Commerce Commission exam for a truck driver and that Brand S and Louisiana Pacific would not hire him because of his history and disabilities.
 "I indicated that at that time his condition was permanent and stationary and there was nothing that could be done to make him employable."

4. Gordon did testify that he sought rehabilitation through the Department of Employment, but was turned away.

previous type of employment in order to qualify as an "odd lot" worker. As in the *Lyons* case, he must show what other types of employment he has attempted. The commission, as the factfinder, must consider whether the claimant has tried and could not perform *other* work. In the absence of such a showing, claimant failed to establish that there was no suitable occupation available to him. *See Exxon Co. v. Alexis*, 370 So.2d 1128 (Fla.1978); *Deaton v. State Accident Ins. Fund*, 13 Or.App. 298, 509 P.2d 1215 (1973); Larson, *supra*, § 57.61.

We affirm the Industrial Commission's finding that Mr. Gordon was permanently and partially disabled only to the extent of 15% of the whole man, and the award made to him by the commission. Because we affirm the commission's finding, we conclude that the Idaho Special Indemnity Fund was properly dismissed from this action.

McFADDEN and DONALDSON, JJ., and SCOGGIN, J. pro tem., concur.

BISTLINE, Justice, dissenting:

My concern is that those who practice workmen's compensation law will find this case indistinguishable from the recent cases of *Lyons v. Industrial Special Indem. Fund*, 98 Idaho 403, 565 P.2d 1360 (1977) and *Francis v. Amalgamated Sugar Co.*, 98 Idaho 407, 565 P.2d 1364 (1977). The Court's opinion does not deign to illustrate the distinction, or even make the attempt. The Court's failure to follow such recent precedent is indeed perplexing, but its failure to distinguish these cases is totally inexcusable. Unfortunately, it comes after a string of workmen's compensation cases wherein the Court has risen to commendable heights in this particular field, the most recent of which is *Sines v. Appel*, 103 Idaho 9, 644 P.2d 331 (1982) (holding that it is within the power of the Industrial Commission under I.C. § 72–719(3) to review a previous workmen's compensation award in a case in which the circumstances demonstrate that the award was manifestly unjust).

Like the claimant in *Lyons*, Mr. Gordon is obviously "a man of star-crossed fortune." He has had a long succession of injuries, a description of which is adequately set forth in the Court's opinion. Mr. Gordon's luck, however, appears to be a great deal worse than that of Mr. Lyons. In *Lyons*, this Court held that the evidence as a matter of law placed the claimant within the odd lot category and remanded the case for further proceedings. A similar result was reached in *Francis*. In this case, however, despite the fact that the factual situation is even more compelling than in *Lyons* or *Francis*, this Court ignores those recent cases and affirms the Commission's finding of a 15% disability.[1]

In *Francis*, the Court held that the following facts established as a matter of law that the claimant had made out a *prima facie* case that he should be placed in the odd lot category:

"The claimant in this case has the equivalent of a twelfth grade education. He is now in his mid-forties. His work history has been in construction or heavy equipment repair and has always involved heavy lifting. However, since the time of the industrial accident he testified that he has been unable to do the moderate to heavy lifting necessary for performance of his former work. Since that time he has not found permanent employment. He has discontinued the types of employment that he has attempted which involved bench or chair work because he has experienced pain in his lower back and legs after prolonged sitting. His efforts at vocational rehabilitation have not been successful. A Department of Employment job counselor testified upon the claimant's behalf that there was no stable labor market for the type of work that the claimant could perform, although he did not preclude the possibility that the

---

1. The Court does cite *Lyons* for the general propositions of law contained therein, but at no point does it distinguish either *Lyons* or *Francis*. The court's failure to explain why the result in this case is different than that reached in *Lyons* and *Francis*, may indeed puzzle the trial bench and the Commission. It certainly leaves me guessing.

claimant might be retrained for work in other fields." 98 Idaho at 409, 365 P.2d at 1366.

Similarly, in *Lyons* the Court relied on the following evidence to conclude as a matter of law that the claimant fell within the odd lot category:

"He is a 48-year-old male with a ninth-grade education. His vocational training and skills are confined solely to heavy manual labor, which he can no longer perform. As a result of his injuries, he experiences almost constant pain in both of his legs, his left arm, and the cervical, thoracic, and lumbar areas of his spine. He testified that the pain increases if he either sits in one place or walks around for any length of time. Appellant is also restricted in his ability to lift objects and to use his arms. He lives in a small mountain community where the opportunities for light work are limited. Therefore, *the Fund must show that some kind of suitable work is regularly and continu-*

*ously available to appellant."* 98 Idaho at 407, 565 P.2d at 1364 (emphasis added).

Quite evidently, the Court has simply avoided any attempt at distinguishing the indistinguishable. In fact, Mr. Gordon is at a significantly more advanced age than claimants Lyons and Francis. He is, on the record, a 57-year-old male with the equivalent of a high school education. He was employed as a lumber truck driver from approximately 1946 until January 8, 1976—the date of the accident. As a result of the accident, he experiences almost constant pain in his left arm and shoulder. Since the time of the accident he has been unable to return to his former employment because he cannot pass the physical examination necessary to receive a card from the Interstate Commerce Commission. He has not been able to find other permanent employment. He has had to discontinue the employment he has attempted because of the physical difficulties and pain that resulted.[2] Mr. Gordon is restricted in his ability to lift

---

2. As the Court notes, Mr. Gordon attempted to work as a truck driver following the accident—the only skill the record reveals Mr. Gordon possesses. Mr. Gordon testified that he tried to work for L. C. Walson on two different occasions. The first job was driving a belly dump truck hauling crushed gravel, a job which obviously did not require the same level of exertion as driving a log truck, since there were no binders or cables to put on. When asked why he did not continue with the job, Mr. Gordon stated: "I couldn't rest—I couldn't do the job ten hours a day." Mr. Gordon also testified that he tried hauling logs for L. C. Walson, and that at the most he worked twenty days total. He testified: "I was limited. I could haul the logs but I couldn't do anything with the wrappers and binders." He stated that all he did was drive and that somebody else loaded and unloaded the logs. He also stated that during the twenty days he worked he made "maybe one trip one day and maybe two the next." That compares with five or six trips a day that Mr. Gordon testified that he made before the accident in question. When questioned as to why he was not still hauling logs for Mr. Walson, the following exchange took place:

"A. I can't cut it, couldn't do it.
Q. What do you mean, you can't cut it; what happens?
A. Well, as a gypo, you have to—it's a young man's job, I'll put it that way. I just can't keep up with them.

Q. Did it cause you any physical difficulties?
A. My neck was burned so bad, I would have to stop and my arm would go numb." Mr. Gordon also stated that his arms would go numb when he was driving and that he could drive two hours at the most without seeking relief. He stated that he would have to "[p]ull over and stop, walk around. If I could leave one arm down, it would come back to life and leave the other one on the wheel, but you can't do that and shift."

Mr. Gordon testified that L. C. Walson was a friend of his and that he had worked for Walson before. In *Lyons*, the Court in discussing workers in the odd lot category stated: "While they are physically able to perform some work, they are so handicapped that they will not be employed regularly in any well-known branch of the labor market—absent a business boom, the sympathy of a particular employer or friends, temporary good luck, or a superhuman effort on their part." 98 Idaho at 406, 565 P.2d at 1363. In this case, the fact that Mr. Gordon attempted to do some work of a less physically demanding nature does not indicate that he is able to return to work, especially when the record demonstrates that the opportunities were provided by a friend and that Mr. Gordon was not able to fulfill the job requirements because of the physical difficulties that resulted.

objects and to use his arm. He lives in a small mountain community (Sandpoint) in which the opportunities for light work are, without doubt, limited. He was turned away by the employment office when he sought vocational rehabilitation.

In other cases a less vacillating court has held that such facts demonstrate as a matter of law that the claimant has made out a *prima facie* case that he should be placed in the odd lot category. *See Lyons,* 98 Idaho at 407, 565 P.2d at 1364; *Francis,* 98 Idaho at 409, 565 P.2d at 1366. There is no testimony in the record that Mr. Gordon could work for a full day at a time in a sedentary-type job, and no testimony that there is a healthy labor market for such jobs for male workers in Sandpoint, Idaho, or that there was training available for such jobs. *Cf. Reifsteck v. Lantern Motel & Cafe,* 101 Idaho 699, 619 P.2d 1152 (1980) (holding that such evidence was sufficient to support the Commission's finding that the claimant did not fall into the odd lot category and thus was only entitled to a 15% disability rating). Therefore, the burden properly fell on the Fund to demonstrate that there was some kind of suitable work regularly and continuously available to the claimant. *Lyons,* 98 Idaho at 407, 565 P.2d at 1363; *Francis,* 98 Idaho at 409–10, 565 P.2d at 1366. It was that exact reasoning which I understood motivated our decision in *Lyons.* Certainly, it is not the claimant who knows the labor market and has access to sources beyond the ken of a working claimant. And it is not the claimant who has the resources to establish the condition of the labor market for his remaining capabilities, if any. To hold otherwise under the facts of this case, would be to require that the claimant "try to prove the universal negative of not being employable at any work." 98 Idaho at 407, 565 P.2d at 1364. We specifically declined to impose such a burden on claimant in *Lyons,* stating that "[i]t is much easier for the Fund to prove the employability of the appellant for a particular job . . ." *id.* at 406, 565 P.2d at 409, and if there be in this case some cogent reason for imposing such an unreasonable burden on Gordon, it totally escapes me, and no attempt has been made at any enlightenment.

In *Lyons,* the Commission found that the claimant's most recent injury was not totally disabling. It also noted that the claimant's previous injuries were not disabling since he had engaged in gainful employment after each of these injuries. After reviewing the record in *Lyons,* the Court concluded: "The Commission then apparently concluded that since the 1972 injury was not by itself totally disabling, and since the pre-1972 injuries had not been disabling in the past, the appellant was not totally and permanently disabled." 98 Idaho at 406, 565 P.2d at 1363. The Court rejected the Commission's approach, stating:

"This piecemeal evaluation of appellant's injuries is unacceptable.

"An evaluation of total disability requires an appraisal of the claimant's *present* and probable *future* ability to sell his services in a competitive labor market. I.C. § 72–425. . . . [T]he effect of successive injuries may be greater than the sum of the impairments resulting from each. The Commission must therefore evaluate appellant's ability to find employment in the future after considering all of his physical impairments, not just the most recent one.

"In addition to the medical factor of permanent impairment, the Commission must also consider nonmedical factors such as age, sex, education, economic and social environment, training, and usable skills. I.C. § 72–425. The Commission's approach does not adequately consider the effect of these nonmedical factors on appellant's ability to obtain employment." *Id.* (Emphasis in original.)

An approach remarkably similar to that in *Lyons* was employed by the Commission in this case. In its Findings of Fact, the Commission found that Mr. Gordon's disability had been rated as "a total of 15% of the whole man." Then the Commission reviewed the previous injuries of the claimant and stated: "After each of these injuries, the Claimant returned to his usual occupation as a heavy truck driver. The only

difficulty he ever experienced was difficulty in using his right foot to operate the throttle of the truck. However, by building up the floorboard of the truck, he was able to drive the truck without difficulty despite his fused right ankle." The Commission also found that Mr. Gordon "is not able to work regularly in his former occupation as a log or lumber truck driver," but that he "is not disabled for other less physically demanding occupations." (Presumably it may have had in mind selling pencils on the streets of Sandpoint.) Based on these findings the Commission concluded that "[a]s a direct result of said accident and injury, the Claimant suffered a permanent partial disability of 15% of the whole man . . . ." Thus, as in *Lyons*, nothing in the record demonstrates that the Commission considered the effect of the combination of all of the claimant's physical impairments when taken together. Because the record demonstrates that the approach employed by the Commission in this case was the equivalent of that used in *Lyons*, it is implicit that the Commission "equated the rating of the claimant's permanent impairment with its rating of his disability without explicit consideration of the types of employment the claimant can now perform." *Francis*, 98 Idaho at 408, 565 P.2d at 1366. To hold otherwise would leave us with no way to determine whether the Commission did in fact follow the mandate of the legislature in evaluating a claimant's permanent disability. *See* I.C. § 72-425.

I cannot agree with the Court that the Commission's decision is supported by the evidence. There is absolutely no evidence in the record to support the Commission's conclusion that Mr. Gordon is not disabled for less physically demanding jobs. In fact, the evidence demonstrates otherwise.

In finding sufficient evidence to support the findings of the Commission, the Court states that the testimony of Dr. Lynch "indicated that if capsulitis is diagnosed early and treated appropriately it would last, at the most possibly six months." What Dr. Lynch actually stated was that capsulitis "can be incapacitating depending on how severe it is, but if it's gotten out early and

treated appropriately the vast majority of it clears up completely." Dr. Lynch also stated, when asked what he thought as to how long capsulitis might last if it was "properly followed through and treated," that he would expect the capsulitis to last "six months, possibly, at the most." Dr. Lynch, however, said that while he could diagnose the problem, he could not treat it, so he referred Mr. Gordon to an orthopedic surgeon. Thus, Dr. Lynch had no idea of whether Mr. Gordon's condition had in fact improved, and his testimony of what he would *expect* under optimum conditions clearly does not support the Commission's findings.

The Court also states that Dr. Lynch "testified as to a report of June 13, 1977, not contained in the record, which indicated that Gordon probably would be able to return to gainful employment when his capsulitis ended." A careful review of the record reveals that Dr. Lynch testified at one point that: "I have in my report of June 13, he persisted in having left shoulder pains, and I believe it is well for the patient to see an orthopedic surgeon." Later in the deposition, after Dr. Lynch stated that he would expect claimant's capsulitis to last six months if it were properly treated, the following exchange took place:

"Q. All right, and that would be in keeping with the comment that you made in your June 13, 1977 letter that his shoulder problem could be corrected and he probably will be able to return to gainful employment, that's what you had in mind?

A. Correct."

It is manifestly unfair to conclude from this exchange that Dr. Lynch's June 13 report, which is not in the record, stands for the proposition that Mr. Gordon would probably be able to return to gainful employment. Those are the words of the cross-examining attorney and are not consistent with Dr. Lynch's previous testimony concerning what the June 13 report contained. Even if such a conclusion were appropriate, what Dr. Lynch *thought* or *expected* when he last

examined Mr. Gordon is irrelevant. Dr. Lynch testified that "[u]sually if there is a real severe problem [with capsulitis] I'll refer this to an orthopedic surgeon." He also stated that he could diagnose, but not treat the problem. Dr. Lynch did refer Mr. Gordon to an orthopedic surgeon and was not thereafter involved in the treatment of Mr. Gordon's capsulitis. Thus, his testimony as to what he thought or expected is not competent evidence to sustain the Commission's findings.

The Court does acknowledge that Dr. Blaisdell testified "that he told the plaintiff that there was nothing that could be done to make him employable." The Court, however, proceeds to relegate this testimony to oblivion by saying that "this statement referred to claimant's inability to pass the Interstate Commerce Commission test, in relation to truck driving activities." I do not see the doctor's statement as intended to be so limited. In response to a question as to what opinions or knowledge he gained in his October 11, 1977, examination of Mr. Gordon, Dr. Blaisdell answered:

> "First of all, his right ankle was not preventing him from returning to work as a truck driver. However, his shoulder, namely the left shoulder at that time was not significantly sympomatic and a pinched nerve in the neck had responded quite well to treatment. The patient told me he could work at that time if he could pass the exams. But said he could not pass the Interstate Commerce Commission exam for a truck driver *and that Brand S and Louisiana Pacific would not hire him because of his history and disabilities.*
>
> "I indicated that at that time his condition was permanent and stationary and there was nothing that could be done to make him employable." (Emphasis added.) [3]

Clearly, Dr. Blaisdell's statement does not support the Commission's finding that Mr. Gordon "is not disabled for other less physically demanding occupations." At best it supports the Commission's finding, which I do not dispute, that Mr. Gordon "is not able to work regularly in his former occupation as a log or lumber truck driver."

There is no dispute that after the largely successful operation to remove the osteophyte, Mr. Gordon continued to have problems with his shoulder and arm and that those problems were directly related to the industrial accident. Mr. Gordon was referred by Dr. Lynch to an orthopedic surgeon for the treatment of his shoulder and arm problems. Dr. Blaisdell, the orthopedic surgeon with whom the claimant did consult, testified that Mr. Gordon had a 15% *physical impairment* based on range of motion or the lack thereof as a result of the most recent industrial accident. He further testified that when all Mr. Gordon's physical impairments are combined they are equal to 25% of the whole man. Nothing in the doctor's testimony contradicts in any way Mr. Gordon's testimony that he could not work, nor was any testimony offered which contains even the slightest suggestion that Mr. Gordon is able to work. The only testimony presented to the Commission was that of the claimant and his physicians and this testimony established that Mr. Gordon could not work. Neither the employer nor the Fund presented any additional witnesses.

The Court also states that the Commission "must consider whether the claimant has tried and could not perform *other* work . . . ." However, it does not appear that the Commission did so. The only considerations which appear in the record are a consideration of the claimant's past injuries—which injuries are negated by the Commis-

---

3. The fact that the doctor referred to passing the Interstate Commerce Commission exam *and* the fact that the claimant told him that Brand S and Louisiana Pacific would not hire him because of his history and disabilities demonstrates that the doctor was not merely referring to the claimant's ability to pass the ICC exam when he stated that "there was nothing that could be done to make him employable." The doctor in all likelihood realized, as the Commission should have, that the only jobs that were available for the claimant in or near Sandpoint, Idaho, were truck driving jobs or jobs involving heavy manual labor. The record shows that claimant was unable to perform such jobs.

sion—and a consideration of the claimant's impairment rating of 15%. The uncontradicted testimony of the claimant was that he attempted to get vocational rehabilitation through the employment office, but that he was turned down. In addition, Mr. Gordon's uncontradicted testimony was that he tried to perform other less demanding truck driving jobs, but that he could not perform such jobs because of the pain that resulted. Nowhere in the record does it appear that the Commission considered this testimony. Nor is there any indication that the Commission considered any nonmedical factors such as age, sex, education, economic and social environment, training, and usable skills, as required by I.C. § 72–425 and *Lyons, supra.* This sort of piecemeal evaluation of a case, was the approach rejected by the Court in *Lyons,* and I can see no reason why we should condone it in this case.

The evidence readily demonstrates that, as a matter of law, the claimant has made out a *prima facie* case that he falls into the odd lot category. This conclusion is mandated by the Court's holdings in *Lyons* and *Francis.* The Court, however, does not distinguish these recent cases. In a neat lateral arabesque, it side-steps the entire issue by finding, in essence, that "there was substantial competent evidence to sustain the Commission's finding that after December 24, 1977, claimant's permanent disability caused by the 1977 accident did not exceed his permanent impairment rating of 15% of the whole man." [4] I would reverse this case and remand it for further proceedings in which the Fund would have the burden of showing that there is some kind of suitable work regularly and continuously available to the claimant. *See Lyons* and *Francis, supra.*

I dissent.

---

4. A chief worry plaguing me is that the trial bench will join the claimant in surmising that the court's opinion this day handed down is influenced by Gordon's age, which approaches Social Security requirements for retirement.