756 P.2d 401

**Larry M. KINDRED, Claimant–Respondent,**

v.

**The AMALGAMATED SUGAR COMPANY, Employer–Appellant,**

and

**State of Idaho, Industrial Special Indemnity Fund, Defendant.**

No. 16837.

Supreme Court of Idaho.

March 25, 1988.

On Denial of Rehearing June 22, 1988.

---

* Walters, J., Chief Judge, Court of Appeals, sitting by designation of the Court.

Houst, Carty & Dredge, Boise, for the employer-appellant. Richard K. Dredge, argued.

John F. Greenfield, Boise, for claimant-respondent.

HUNTLEY, Justice.

Larry Kindred's left leg was amputated after he was injured in an industrial accident occurring on August 11, 1975. Dr. George Warner performed the above-the-knee amputation which resulted in a permanent partial physical impairment rating of ninety percent as compared to the loss of

the leg at the hip. Primarily, there are two issues in this appeal: (1) Whether a claimant can only seek modifications of his worker's compensation award pursuant to I.C. § 72–719, as provided on the face of the compensation agreement; (2) Whether the Industrial Commission inappropriately applied the 1978 version of I.C. § 72–706(2) instead of the older version of the statute. Although protracted, the facts that follow are critical to the determination of this appeal.

After the amputation, Kindred returned to work at Amalgamated Sugar in May 1976, and was continuously employed there through 1983. Kindred's first job after returning from his accident was operating a vacuum sweeper to remove sugar from the floor of large sugar bins. He worked as a sugar sweeper for approximately one year before requesting a transfer because he was having difficulty with his artificial leg while maneuvering under the augers used to remove the sugar from the bin. Kindred was then assigned to work in the area where sugar was bagged, and his duties included placing sugar bags on the machines as well as other miscellaneous duties. This job continued for approximately one year. He was then transferred to a storeroom where he worked as an issue clerk. As an issue clerk, Kindred issued parts or supplies to other employees. He remained in this position approximately three years. Although he was able to perform this work, it was frequently necessary for him to admit employees to the storeroom to remove their own supplies or parts since he could not lift the heavier objects. Kindred was then transferred to the tool crib, which was considered to be a lighter job than the storeroom position. In the tool crib, Kindred's duties entailed issuing tools to employees as they needed them. However, it was still occasionally necessary for Kindred to admit employees to the tool crib to remove their own tools when he could not lift or carry them. Kindred remained in the tool crib approximately one year until he required additional medical treatment.

Although Kindred had experienced difficulties and discomfort, he continued to wear his prosthesis on a regular basis from 1976 through 1982. He continued to have difficulties with the prosthesis despite the fact that he had at one point been fitted with a new artificial limb.

In January, 1982, Kindred consulted Dr. Warner about a lipoma, or fatty tumor, which had developed on the inner aspect of his left thigh in the area where he wore the socket for his artificial leg. Kindred was not able to wear his prosthesis due to the irritation, tenderness and swelling in the area of the lipoma. Dr. Warner surgically removed the lipoma in April, 1982, and Kindred was not able to return to work until his leg had completely healed, which appears to be sometime in August or September of 1982.

Kindred attempted to wear the artificial limb in 1982 after the lipoma had been removed from his stump. However, he still had difficulty wearing the limb and ultimately ceased wearing it, choosing instead to ambulate entirely with the use of two crutches. The Industrial Commission determined that Kindred ceased to use his artificial limb because of discomfort.

Kindred returned to work in the tool crib in September, 1982, and worked there through the entire calendar year of 1983. Since Kindred was no longer wearing his prosthesis, ambulating by the use of crutches severely hampered his usefulness in the tool crib. Although Kindred could carry many tools in his hands while ambulating with crutches, he still had to admit fellow employees into the tool crib to carry their own tools when these tools proved to be too heavy or cumbersome for a man on crutches to handle. Kindred estimated that he stood approximately seventy percent of the time and sat approximately thirty percent of the time while working in the tool crib. He also had some difficulty sitting because of pain in the bottom side of the stump of his left leg.

In 1983, Amalgamated discussed with Kindred the possibility of his entering a training program, and he was evaluated at a rehabilitation center in Twin Falls. Kindred's supervisor indicated that the pur-

pose of retraining would be to make him a more productive individual and get him out of a dead-end position, as he had no opportunity for advancement in the tool crib job. Amalgamated's manager of employee benefits agreed to pay for Kindred's training in a welding program at the College of Southern Idaho. Kindred entered the welding program in January, 1984, and remained in the program the entire calendar year. Amalgamated paid Kindred's regular wages of $7.20 per hour while he attended school as well as his tuition expenses. Though Kindred received "A" grades in the welding program, it was apparently never taken into consideration by Amalgamated or the College of Southern Idaho that a man who is unable to ambulate by the use of an artificial leg would also be unable to do most of the heavy lifting which is a necessary part of any welding position. Since Amalgamated had no openings available for a welder when Kindred completed his course, his employment was formally terminated effective January 31, 1985. The reason given on Kindred's termination slip was "physical incapacity."

Kindred received worker's compensation benefits from Amalgamated during the period between 1975 and 1982. In September 1976, a compensation agreement was entered into between Kindred and Amalgamated and its surety which was approved by the Industrial Commission on September 15, 1976. The sum of money provided for in this agreement had previously been paid to the claimant, and the Industrial Commission determined that the compensation agreement represented "primarily an acknowledgement of the payments which had been made."

On June 28, 1985, Kindred filed Application for Hearing, seeking benefits from Amalgamated for total and permanent disability. In preparation for the upcoming hearing, Kindred was examined by two psychiatrists. In 1985, Dr. Richard Worst, of Twin Falls, diagnosed him as suffering from a "dysthemic reaction," or depression related to the loss of his leg. Dr. Worst also diagnosed Kindred as having a passive-dependent personality disorder and an alcohol dependency problem. He believed

these problems were primarily caused or aggravated by Kindred's injury and, thus, estimated his permanent impairment to be fourteen percent. Dr. Eric Holt of Boise examined Kindred in 1986, and also diagnosed Kindred's condition as a dysthemic reaction. Additionally, Dr. Holt believed that Kindred had a passive-aggressive personality disorder, an alcohol dependency problem and a learning disability, all of which preexisted his injury. Dr. Holt estimated Kindred's permanent impairment as five percent of the whole man. Kindred, whose intelligence quotient had been tested to be well below average, moreover, had been advised as a child by school officials that it would not be beneficial for him to continue his education beyond the eighth grade.

Kindred was also examined by two rehabilitation consultants. Thomas A. Wilson, a psychologist, interviewed Kindred twice in 1985. Mr. Wilson familiarized himself with Kindred's employment history, with his medical problems and with Dr. Worst's mental status evaluation. After spending a day in December, 1985, looking for employment in the Twin Falls area, Mr. Wilson was unable to locate at that time any specific job openings for Kindred. Mr. Wilson concluded that Kindred was precluded from performing welding jobs because lifting more than twenty-five pounds would be required and because Kindred is unable to sit comfortably for long periods of time. Wilson also contacted the Department of Employment and reviewed want ads in a newspaper as part of his job search. In Wilson's opinion, Kindred's access to the local labor market had been reduced by one hundred percent as a result of his injury. Kindred was also interviewed by John Janzen, a private rehabilitation specialist. Mr. Janzen made a number of inquiries by telephone, contacting various employers in the Twin Falls area. Janzen suggested two possible job openings but Kindred did not pursue these suggestions. Janzen believed that Kindred could obtain employment as a security guard, as a truck dispatcher, or as a self-service gas station attendant. Janzen also believed that Kindred could obtain

employment at an auto paint store; however, the manager of that store testified that Kindred would be unable to perform that type of employment since it entailed lifting heavy containers of paint.

On December 1, 1986, the Industrial Commission filed its Findings of Fact, Conclusions of Law, and Order determining that Kindred was not totally and permanently disabled, noting in particular that following his injury he worked in at least four different jobs for several years for Amalgamated for relatively long periods of time. The Commission also noted that even if Kindred was not able to wear an artificial limb, he was nevertheless employable. The Commission also concluded that Kindred's claim was barred under I.C. § 72–706 (amended 1978), which provides that an application for hearing must be filed within one year after the last compensation was paid to the claimant. Since the Commission considered neither the tuition paid for Kindred's retraining program nor the wages paid to Kindred during his retraining as compensation, it determined that the last compensation paid was in September, 1982, and that no further compensation payments were made to him before he filed his Application for Hearing on June 28, 1985.

In December, 1986, Kindred filed a motion for reconsideration or, in the alternative, a motion for rehearing. On January 16, 1987, the Industrial Commission heard oral argument on Kindred's motion for reconsideration or rehearing. After this hearing, the Commission issued its new Findings of Fact, Conclusions of Law and Order on Reconsideration, filed February 6, 1987. In its Order on Reconsideration, the Commission completely reversed its prior holding by determining that Kindred was presently totally disabled. The Commission further held that "[d]espite the fact that the claimant worked for several years for Amalgamated following his injury, these jobs were primarily 'make-work' type jobs ...." The Commission noted that Kindred wore his prosthesis for several years only at the cost of discomfort and pain, and that at the present time Kindred was unable to use his prosthesis. The Commission further concluded that any efforts on the part of Kindred to seek work or engage in work would be "futile." Finally, the Commission held that Kindred had timely filed his Application for Hearing under I.C. § 72–706. Essentially, the Commission found that the wages and tuition paid for Kindred's retraining course at Southern Idaho College were in fact further compensation payments. Since compensation payments were made to Kindred in connection with his retraining course as late as January, 1985, and he filed his Application for Hearing on June 28, 1985, the Industrial Commission determined that his claim was not barred by I.C. § 72–706.

## I.

Amalgamated contends that the Commission misapplied I.C. § 72–719 by awarding Kindred additional benefits other than continued medical care.[1]

Amalgamated further contends that the language on the face of the compensation

---

1. I.C. § 72–719 reads:

**Modification of awards and agreements— Grounds—Time within which made.**—(1) An application made by a party in interest filed with the commission *at any time within five (5) years* of the date of the accident causing the injury or date of first manifestation of an occupational disease, on the ground of a change in conditions, the commission may, but not oftener than once in six (6) months, review any order, agreement or award upon any of the following grounds:

(a) Change in the nature or extent of the employee's injury or disablement; or
(b) Fraud.

(2) The commission on such review may make an award ending, diminishing or increasing the compensation previously agreed upon or awarded, subject to the maximum and minimum provided in this law, and shall make its findings of fact, rulings of law and order or award, file the same in the office of the commission, and immediately send a copy thereof to the parties.

(3) The commission, on its own motion at any time *within five (5) years* of the date of the accident causing the injury or date of first manifestation of an occupational disease, may review a case in order to correct a manifest injustice.

(4) This section shall not apply to a commutation of payments under section 72–404. (Emphasis added).

agreement is controlling and states that Kindred could only seek modifications of his award as outlined in I.C. § 72–719, which limits modifications to within five years from the date of the accident:

> This agreement is subject to Section 72–719 of the Idaho Workmen's Compensation Law; *it is not a full and final release;* and the employee can re-open the claim upon a change in condition within five years of the date of the accident. The employee should contact the surety as soon as possible if a change in condition develops or if further medical care is needed.

However, the Commission correctly determined that the proceedings below were not brought pursuant to I.C. § 72–719. The Commission stated that the compensation agreement "simply reaffirmed that the payments had been made, and the payments were obviously made voluntarily by Amalgamated, thereby bringing the case within the application of § 72–706(2) Idaho Code. *Woodvine v. Triange [Triangle] Dairy,* 106 Idaho 716 [682 P.2d 1263]." Upon reconsideration, the Commission held that the award of wages and retraining benefits throughout the year 1984 were additional compensation benefits, apparently because these retraining benefits were not awarded pursuant to the compensation agreement filed in September, 1976.

[2] A compensation agreement is res judicata only with respect to matters already decided by that agreement. *Banzhaf v. Carnation Co.,* 104 Idaho 700, 703, 662 P.2d 1144, 1147 (1983). Since the compensation agreement between Kindred and Amalgamated did not determine the retraining benefits, it cannot be considered res judicata with respect to any new awards, as I.C. § 72–718 distinctly provides: "A decision of the Commission ... shall be final and conclusive *as to all matters adjudicated....*" (Emphasis added).

## II.

The next issue is whether the Commission inappropriately applied the 1978 version of I.C. § 72–706(2) instead of the older version of the statute.

In 1971, the Idaho Legislature enacted I.C. § 72–706, which reads in pertinent part:

**Limitation on time on application for hearing.—**

....

> (2) When compensation discontinued. When payments of compensation have been made and thereafter discontinued, the claimant shall have five (5) years from the date of the accident causing the injury or date of first manifestation of an occupational disease, within which to make and file with the commission an application requesting a hearing for further compensation and award.

The legislature later revised I.C. § 72–706(2) in 1978 to read as follows:

> (2) When compensation discontinued. When payments of compensation have been made and thereafter discontinued, the claimant shall have five (5) years from the date of the accident causing the injury or date of first manifestation of an occupational disease, or *if compensation is discontinued more than five (5) years from the date of the accident causing the injury* or the date of first manifestation of an occupational disease, *within one (1) year from the date of the last payment of compensation,* within which to make and file with the commission an application requesting a hearing for further compensation award. (Emphasis added).

[3] Amalgamated contends that since Kindred's cause of action accrued in August of 1975, the 1971 version of I.C. § 72–706(2) should be applied, which would have effectually barred Kindred's filing of an application for hearing anytime after August, 1980 (i.e., anytime five years after the accident). Amalgamated argues that to apply the 1978 version of the statute to Kindred's application for hearing is to give the 1978 version retroactive effect. We disagree.

[4] A statute is not made retroactive merely because it draws upon facts antecedent to its enactment. *Holt v. Morgan,* 128 Cal.App.2d 113, 274 P.2d 915 (1954).

"[I]t is generally and rather consistently held by most courts that statutes enlarging the period of limitations apply to existing causes of action that had not been barred by the previous limitation. It is held that such statutes are not retrospective in application but are merely an extension of the right to bring the action." *Nichols v. Wilbur*, 256 Or. 418, 473 P.2d 1022, 1022 (1970). See also, *Davis & McMillan v. Industrial Accident Comm.*, 198 Cal. 631, 246 P. 1046 (1926), and, Annotation, 79 A.L.R.2d 1080.

The Industrial Commission correctly applied the revised version of I.C. § 72–706(2), because the 1978 statute was enacted before the five year period under the old statute (August 11, 1975 to August 10, 1980) had run. Since the Commission correctly ruled that the benefits *voluntarily paid* by Amalgamated for Kindred's retraining were made pursuant to Title 72, Kindred timely filed his application requesting a hearing for further compensation, because Amalgamated paid the retraining benefits through December of 1984, and Kindred filed his application for hearing in June of 1985—well within one year from "the date of the *last payment* of compensation...." I.C. § 72–706(2) (Emphasis added).

■ Amalgamated also argues that it did not believe it owed Kindred a responsibility to pay for his retraining and that these payments were not classified as retraining benefits by the employer; nor did the Commission order or authorize retraining benefits pursuant to I.C. § 72–450.[2] The Commission ruled that, "Amalgamated provided the [retraining] program as a workmen's compensation benefit or as the result of its retraining obligation under the workman's compensation law." Although it appears that the retraining program was not proffered pursuant to the procedure outlined in I.C. § 72–450, we agree it was nevertheless a worker's compensation benefit. Finally, Amalgamated suggests that the Industrial Commission exceeded its authority by reversing itself from its first decision to its decision upon reconsideration. Amalgamated contends that the Commission's authority under § 72–718 should be limited to correcting oversights or making technical corrections.[3] We disagree.

■ A review of the evidence reveals that the Commission properly reversed its Findings and Conclusions upon reconsideration of the facts and applicable law. Amalgamated progressively moved Kindred to less demanding jobs, until finally terminating his employment because of "physical incapacity." Kindred suffered pain and discomfort to the point that he no longer wears his prosthesis even though he had the lipoma surgically removed from his stump. And, coupling Kindred's low I.Q. and eighth grade education with the testimony of the psychologists and rehabilitation consultants, the evidence supports the Commission's conclusion that "efforts on

2. **72–450. Retraining.**—Following a hearing or informal conference upon motion of the employer, the employee or its own motion, if the commission deems a permanently disabled employee, after the period of recovery, is receptive to and in need of retraining in another field, skill or vocation in order to restore his earning capacity, it may authorize or order such retraining and during the period of retraining or any extension thereof, the employer shall continue to pay the disabled employee, as a subsistence benefit, temporary total or temporary partial disability benefits as the case may be. The period of retraining shall be fixed by the commission but shall not exceed fifty-two (52) weeks unless the commission, following application and hearing, deems it advisable to extend the period of retraining, in which case the increase period shall not exceed fifty-two (52) weeks.

3. **72–718. Finality of commission's decision.** —A decision of the commission, in the absence of fraud, shall be final and conclusive as to all matters adjudicated by the commission upon filing the decision in the office of the commission; provided, within twenty (20) days from the date of filing the decision any party may move for reconsideration or rehearing of the decision, or the commission may rehear or reconsider its decision on its own initiative, and in any such events the decision shall be final upon denial of a motion for rehearing or reconsideration or the filing of the decision on rehearing or reconsideration. Final decisions may be appealed to the Supreme Court as provided by section 72–724, Idaho Code.

the part of the Claimant to engage in work or seek work would be futile."

In *Lyons v. Industrial Specialty Indemnity Fund*, 98 Idaho 403, 406, 565 P.2d 1360, 1363 (1977), this Court stated:

It is not necessary for a person to be physically unable to do anything worthy of compensation to be classified as totally disabled.

"An employee who is so injured that he can perform no services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist, may well be classified as totally disabled." *Arnold v. Splendid Bakery*, 88 Idaho 455, 463, 401 P.2d 271, 276 (1965).

Claimants such as those described in the above quotation from *Arnold* are often classified as "odd-lot" workers. See 2 A. Larson, The Law of Workmen's Compensation § 57.51 (1976). While they are physically able to perform some work, they are so handicapped that they will not be employed regularly in any well-known branch of the labor market—absent a business boom, the sympathy of a particular employer or friends, temporary good luck, or a superhuman effort on their part.

In determining whether Kindred fits into the odd-lot category, the Commission must consider not only the medical factors of permanent impairment, but also nonmedical factors such as age, sex, education, economic and social environment, training and usable skills. *Lyons, Id.;* I.C. § 72–425.[4] Furthermore, odd-lot status is a factual determination within the discretion of the Industrial Commission. *Carey v. Clearwater County Road Dept.*, 107 Idaho 109, 686 P.2d 54 (1984); *Gordon v. West*, 103 Idaho 100, 645 P.2d 334 (1982). We find no abuse of discretion by the Commission in placing Kindred into the odd-lot category. This Court will sustain the Commission's findings of fact if supported by substantial and competent evidence. *Mat-*

*ter of Snyder*, 109 Idaho 167, 706 P.2d 56 (1985).

The decision of the Industrial Commission is affirmed. Costs to respondent, no attorney fees awarded.

SHEPARD, C.J., BAKES and BISTLINE, JJ., and OLIVER, J. Pro Tem., concur.

## ON DENIAL OF PETITION FOR REHEARING

HUNTLEY, Justice.

Amalgamated Sugar has filed a petition for rehearing premised primarily upon its assertion that:

"[t]his Court's decision of March 25, 1988, goes beyond the Commission's finding that Claimant is 'presently totally disabled' and states in dicta that Claimant is totally and permanently disabled under the odd-lot doctrine."

We affirmed the order of the Industrial Commission which specifically states:

"The commission hereby reserves jurisdiction to determine in the future, in the event the claimant's condition is changed by additional medical treatment, whether the claimant continues to be totally disabled or whether the claimant's condition is changed to a condition of permanent partial disability."

The language in our opinion which Amalgamated Sugar questions necessarily should be read in conjunction with the language of the commission's order.

Accordingly, the petition for rehearing is hereby denied.

SHEPARD, C.J., and BAKES and BISTLINE, JJ., concur.

---

4. **72–425. Permanent disability evaluation.—** "Evaluation (rating) of permanent disability" is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by pertinent nonmedical factors provided in section 72–430, Idaho Code.