401 P.2d 271

**Martha ARNOLD, Claimant-Respondent,**

**v.**

**SPLENDID BAKERY and State Insurance Fund, Defendants-Appellants.**

**No. 9522.**

Supreme Court of Idaho.

April 19, 1965.

Coughlan & Imhoff, Boise, for appellants.

Davison, Davison & Copple, Boise, for respondent.

KNUDSON, Justice.

On December 6, 1952, claimant-respondent, Martha Arnold, who was then 27 years of age, sustained an injury to her back by an accident arising out of and in the course of her employment with appellant Splendid Bakery. The accident occurred when respondent slipped on some cellophane paper lying on the bakery floor and fell injuring her back. Respondent has a long history of treatment resulting from said accident, of which the material facts are briefly stated in chronological order as follows:

On December 12, 1952, Gordon Garlock, D. C., examined respondent and following x-ray gave her diathermy and spinal adjustment treatments for about three weeks.

On December 31, 1952 respondent filed a Notice of Injury and Claim for Compensation. Appellant surety, State Insurance Fund, accepted liability and thereafter made payments to respondent for various periods thereafter in an aggregate amount in excess of $12,000 as total temporary disability compensation.

On January 9, 1953 respondent was examined by Dr. John T. Brunn, M. D., by whom she was frequently given diathermy treatments until March 23, 1954.

On January 13, 1953 she was examined by Dr. Delbert Ward, orthopedic specialist, who then reported history and findings of a protruding disc. On January 30, 1953 she was, at the direction of Dr. Ward, admitted to the hospital for traction—results not good. Dr. Ward later performed a

myelogram and on March 25, 1953 he performed a laminectomy.

Respondent returned to work on October 12, 1953 but had to quit after a short time following which she studied a business course and shortly thereafter was employed by a retail mercantile store as bookkeeper.

During the course of Dr. Ward's treatment she was examined by Dr. R. E. Buckmaster, M. D., of Portland, Oregon, who approved of further "myelographic" studies by Dr. Ward.

On July 8, 1954 another myelogram was taken and on August 13, 1954 respondent was, at the request of Dr. Ward, examined by Dr. C. R. Blackburn, M. D., and approximately three months later she was examined by Dr. M. B. Shaw, M. D., orthopedic surgeon, who states in his report that he believed respondent did have a defective lumbosacral disc.

Following an examination by Dr. Robert A. Kuhn, M. D., neuropathic surgeon, made on December 13, 1954, respondent underwent, at his hands, another laminectomy on January 12, 1955.

At the request of appellant surety, respondent was on July 11, 1955, examined by Dr. James J. Coughlin, M. D., an orthopedic specialist who at that time recommended no further treatment. Thereafter, and at the request of appellant surety, respondent was on October 18, 1956, again examined by Dr. Donald J. Baranco, M. D., orthopedic surgeon, who discouraged any additional surgery on respondent.

Dr. Jerome K. Burton, M. D., orthopedic surgeon, first examined respondent on July 5, 1955, and thereafter acted as respondent's principal medical advisor. At his request respondent was on October 9, 1957, examined by Dr. Maurice Burkholder, M. D., as a consultant, who could find no physical condition which would prevent respondent from having surgery on what was thought to be a recurrent disc.

On October 7, 1957, respondent was admitted to the hospital for a myelogram which was given the next day, following which, on October 16, 1957, another laminectomy was performed by Dr. Burton. Thereafter and for a period of approximately four months following December 12, 1957, respondent was given post-operative care and treated by Dr. Verne J. Reynolds, M. D., a gynecologist.

During the year 1958 respondent remained under the care of Dr. Burton, who, on November 4, 1958, performed another laminectomy and a spinal fusion. Respondent was released from the hospital January 21, 1959, and at periodic intervals thereafter was reexamined by Drs. Burton and Burkholder.

On November 29, 1960, another and the final laminectomy was performed upon re-

spondent by Dr. Burton to ascertain with certainty that there had been no recurrence of herniation of a disc and that the spinal fusion was solid.

Respondent's work history following her accident discloses that she worked intermittently until September 18, 1957, since which date she has not been employed.

By the foregoing statement it is intended to mention only the initial examination made by the respective doctors named—no attempt will be made to state in this opinion the many additional examinations made by and interviews had with the doctors mentioned.

On April 29, 1963, appellant surety ceased payment of any compensation to respondent following which she filed an amended petition for a hearing before the Industrial Accident Board, which hearing was held on January 30, 1964. Thereafter the Board made its findings that respondent is totally disabled for work and that such condition is prospectively permanent. By the award entered appellant surety was directed to pay its obligation to her pursuant to the Workmen's Compensation Law so long as her disability shall continue. This appeal is from said findings and award.

■ Appellant contends that the Board erred in holding that respondent was totally disabled for work and that said condition is prospectively permanent. Appellant's argument in support of this contention is concerned largely with the fact that three of the five doctors who testified at the final hearing before the Board, did not express an opinion that respondent was totally disabled. The fact that a greater number of expert witnesses may support a view different from the conclusion reached is not the controlling test for determining the preponderance of the evidence. Tilden v. Hubbard, 25 Idaho 677, 138 P. 1133.

■ The weight and credibility of testimony in a compensation case, including the opinions of experts, is for the Board, and its finding is conclusive on appeal when supported by competent evidence. Lane v. General Telephone Company of Northwest, 85 Idaho 111, 376 P.2d 198; Nitkey v. Bunker Hill & Sullivan Mining & Con. Co., 73 Idaho 294, 251 P.2d 216; Benson v. Jarvis, 64 Idaho 107, 127 P.2d 784. Under said claim of error the issue presented is whether the finding that respondent is totally disabled is supported by competent evidence.

The record discloses that at the final hearing before the Board held January 30, 1964, five doctors, each being an orthopedic surgeon whose qualification was in no respect challenged, testified and each expressed his opinion regarding respondent's disability. The following is a brief statement of the disability rating given by each of said

doctors and the date of his last examination of respondent prior to said hearing:

Dr. Shaw—Last examination had July 10, 1963. Rated her permanent partial disability equal to 30% loss of a leg at the hip.

Dr. Coughlin—Last examination had July 11, 1963. Rated respondent's permanent partial disability at 50% loss of a leg at the hip.

Dr. Taylor—Last examination had July 15, 1963. Rated her permanent partial physical impairment at 20% of the whole man.

Dr. Gardner—Last examination had December 9, 1963. Rated respondent's physical impairment at approximately 50% of the spine and stated: "Based upon the history that the patient gave me and the physical findings that I have, and my opinion of those, I don't think that she will go back to work, or that she will be able to carry on more than just temporary work."

Dr. Burton—Last examination had January 28, 1964. Rated respondent as totally disabled for gainful employment.

This record discloses that during the eleven years intervening the accident resulting in respondent's injury and the final hearing before the Board respondent was examined by fourteen doctors, nearly all of whom were orthopedic physicians and surgeons. The unrefuted medical history of respondent during said eleven years discloses that she has undergone five surgical procedures consisting of laminectomies and fusions, together with three myelograms. She has suffered almost continuous pain for relief from which she takes medication almost daily.

Respondent has been under the care and treatment of Dr. Burton since 1956 and the following is an excerpt from his report to the chief claims examiner of appellant surety, made six years after respondent received the accidental injury involved, dated October 27, 1958:

"The above named, Martha Arnold, has apparently reached a plateau of improvement but she is still totally disabled temporarily. At the present time she is suffering pain in the back and both legs after she has been up from the lying down position. She can be up approximately 30 to 45 minutes before the pain in the back becomes severe enough to require sedation and even with sedation the pain becomes worse and radiates into both legs. She is forced to lie down after being up from 30 minutes to an hour until the pain subsides sufficiently so that she can get up again."

The following is an excerpt from a report by Dr. Coughlin to appellant surety of re-

spondent's condition ten and one-half years after the accident:

"At this time her complaints are as follows. She feels that she is really no better for all the surgery that has been performed on her. She still has the same pain in the lower back and in both legs. She does not wear a back support at this time. She is not active. She partially does her housework. She does no other work. She cannot iron her clothes or wash windows or do work of that sort because of her complaints. Her complaints increase each day toward the end of the day. In other words, activity seems to increase her complaints. Car riding increases her complaints. Standing causes pain. She states she is taking Emperin Compound #3, two at a time, about eight a day, to control her pain. She also takes Norflex medication daily. She is also on a nerve medication. She does not feel she is improving at all. She is not receiving physical therapy at this time but she has in the past. She has also received x-ray therapy to her low back."

Several of the doctors expressed the opinion that respondent could not expect help through further surgery. In this connection Dr. Shaw testified as follows:

"Q What are the probabilities with respect to repeated surgeries?

"A I think the possibility of helping with repeated surgeries get less and less. I mean, each time you have a surgery you have introduced some additional hazard of doing additional damage with the trauma of your operation."

Dr. Burton testified as follows:

"Q Of course you are familiar with all of the surgical history of this woman and the five separate surgical procedures she has been subjected to?

"A Right.

"Q Are these attempts to correct this woman's impairment always successful?

"A No.

"Q Have they been in her case?

"A No, as a matter of fact, none of them have been successful in correcting her pain.

"Q What are the probabilities with respect to any repeated surgical procedures for her?

"A I think they should be avoided at all cost."

As concerns further surgical treatment for respondent Dr. Gardner stated as follows:

"Q Would you recommend any further surgical treatment for this patient?

"A I think with the five surgeries in eleven years and the fact that she is up walking, I wouldn't. I think the chances of any improvement are not in any doctor's favor."

In this connection Dr. Coughlin expressed himself as follows:

"Q Do you feel that she is going to get any better?

"A From an orthopaedic standpoint— I doubt it. It has been ten or eleven years and she has been subjected to a tremendous amount of back surgery, and I don't think she is going to improve. Further, I don't feel any more surgery is indicated. * * *

"Q You didn't find anything in your examination that would lead you to believe that she would improve?

"A No, I think she will probably stay essentially the way I interpreted her as being. Things do smooth off—like rough stones get a little smooth with time, pain does somewhat abate but ten to eleven years

—you have to take that into consideration. I think this is permanent, the way I evaluate it."

The extent of respondent's disability raises a question of fact and the Board's finding thereon, when adequately supported, is not subject to review by this tribunal. McCall v. Potlatch Forests, 67 Idaho 415, 182 P.2d 156. The fact that the Board may have given more weight to the testimony of some doctors in its determination of the extent of respondent's permanent disability is not grounds for reversal if the findings are supported by competent and substantial evidence. Each of the doctors who testified at the hearing did not have the same opportunity of observation and examination of respondent as did Dr. Burton. Dr. Taylor had seen and examined respondent only once; Dr. Coughlin had seen and examined respondent twice; and Dr. Shaw had seen and examined respondent four times, during the eleven years following the accident. She had been under Dr. Burton's care and treatment since July 1956 and he had filed forty-five written reports of her condition with the Board prior to the hearing.

Two of the doctors who testified at the hearing expressed their opinions that respondent would not be able to engage in gainful employment in the future. Only two of the others undertook to rate respondent's disability in comparison to the

specific indemnities set forth in I.C. § 72–313.

█ The other, Dr. Taylor, expressed his rating of respondent's disability in terms of specific indemnity on the basis of comparable loss of "the whole man." In answer to a request that he state what his rating would be for respondent's permanent partial disability, he replied:

"My rating is based on her physical impairment and is that of 20 per cent permanent partial physical impairment of the whole man."

Such rating is not in conformity with the requirement of Idaho Code § 72–313, which provides in part as follows:

"(b) Computation of Specific Indemnity for Nonscheduled Injuries. In all other cases of permanent injury, less than total, not included in the above schedule, the compensation shall bear such relation to the periods stated in the above schedule as the disabilities bear to those produced by the injuries named in the schedule."

The question here presented concerning a proper rating under our law was considered by this court in Hix v. Potlatch Forests, Inc., 88 Idaho, 155, 397 P.2d 237, wherein it is stated that the Workmen's Compensation Law contains no provision for rating a partial permanent disability in terms of specific indemnity comparable to a percentage of total permanent disability or on the basis of comparable loss of "the whole man." It necessarily follows that Dr. Taylor's rating is not capable of being evaluated in terms of our statutory specific indemnities under I.C. § 72–313.

█ This court has recognized that the theory and spirit of the compensation law, except for the specific indemnities mentioned in I.C. § 72–313 is to the effect that compensation is provided to make good the loss of the earning power or capacity to work on account of the injury. However, by total disability is not meant that the injured person must be absolutely helpless or entirely unable to do anything worthy of compensation. An employee who is so injured that he can perform no services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist, may well be classified as totally disabled. Crawford v. Nielson, 78 Idaho 526, 307 P.2d 229; Endicott v. Potlatch Forests, 69 Idaho 450, 208 P.2d 803.

As concerns respondent's ability to expect gainful employment, Dr. Burton testified.

"Q And based upon your examination and treatment of this lady, have you an opinion with respect to her permanent disability?

"A Yes, I do.

"Q What is that opinion?

"A She is totally disabled for gainful employment.

"Q In arriving at that, Doctor, what factors did you take into consideration?

"A The fact that she can neither sit nor stand for more than an hour in any one position without developing enough pain that she has to go lie down and take a rest.

"Q And this condition you feel is a permanent condition?

"A Yes it is. It has been stationary now for better than a year."

 Notwithstanding the existence of a conflict in the opinions of the experts, the testimony of Drs. Burton and Gardner substantially justifies the conclusion of the Board that the respondent is now totally and permanently disabled.

 Appellant also asserts that the Board erred in failing to apportion, as a part of the disability, respondent's psychosomatic symptoms in accordance with I.C. § 72–323, which provides:

"Except as provided in section 72–311, Idaho Code.

"If the degree or duration of disability resulting from an accident is increased or prolonged because of a pre-existing injury or infirmity the employer shall be liable only for the additional disability resulting from such accident.

"Any compensation previously paid an injured workman for permanent disability to any member or part of his body shall be deducted from the amount of compensation provided for the permanent disability to the same member or part of his body caused by a change in his physical condition or by a subsequent accident."

Appellant's contention is predicated upon the assumption that respondent had a pre-existing functional or psychosomatic condition which contributed to her disability. The record does not support such contention. There is no showing whatever that prior to the accident involved respondent had experienced any injury, infirmity or symptom which would justify an apportionment under the provisions of said § 72–323. The record is clear that she was a normally well and healthy person prior to her accidental injury December 6, 1952.

In support of such contention appellant quotes from a report of Dr. Ward made April 9, 1963, wherein the doctor stated that:

"This patient was operated on 3–25–53 and a protruding disc was removed. The patient showed some evidence of

psycho-neurosis while in the hospital but her progress in general is satisfactory."

This report was made after respondent had undergone a myelogram and a laminectomy. Dr. Shaw had made three medical reports regarding respondent prior to the one above quoted and no mention whatever was made by him therein concerning any psychosomatic condition or functional problem. The following is an excerpt from Dr. Shaw's testimony concerning this subject.

'Q Doctor, is it unusual to find a patient who has been in the course of treatment such as Mrs. Arnold, she has had five surgical procedures, three myelograms, is it unusual to find a so-called functional overlay or a psychological problem superimposed upon the physical impairment?

"A No, it is very common to find this in about ten per cent of all patients who have had no operations. As a matter of fact probably every painful condition has some of it."

Dr. Shaw further testified:

"Q Do you feel this woman will get better, Doctor?

"A I would doubt it, no Sir.

"Q In making your examination on her, did you ask her if she was experiencing any pain?

"A Yes, Sir.

"Q Did she say that she was?

"A Yes.

"Q Did you believe her?

"A Yes."

Although several of the doctors who examined respondent during the eleven years following the accident mentioned in their reports that some psychosomatic condition existed, none said it had preexisted the accident. In explanation of the origin of such condition Dr. Coughlin stated as follows:

"Q Doctor, do you feel that it is unusual in a patient who has been through all of the surgical procedures and treatment and long periods of pain that Mrs. Arnold has been through, to find evidence of these psychological factors?

"A No. I am certain that she would have them.

"Q That would be present in almost anyone who had to go through this period of treatment?

"A I feel that way, yes.

"Q This has been referred to as a functional overlay here, I believe, in the previous examination?

"A Yes."

**466**

In this respect Dr. Gardner testified:

"Q To follow that up, Doctor, are you assuming that in this premise that you lay, that the history she has had of the surgeries and her problem over the eleven years have, in themselves, caused this functional problem?

"A Yes, I am assuming that had she not had the back trouble and this repeated problem with her back that this type of thing would not have been built up."

A reasonable interpretation of the doctors' testimony and reports is that the accident and resulting injury played a role in setting up a sequence which produced the end result of a functional overlay. The industrial accident was the occasion or environmental change in which this condition developed. There is no evidence that respondent's psychosomatic condition was precipitated by any event in her life other than the accident here involved.

The facts presented here do not fall within the class of cases where a preexisting injury, disease or ailment is accelerated by an accident happening within the course of employment. The medical experts did not testify that respondent's inability to work was the result of functional overlay or psychosomatic condition.

Appellant asserts the Board erred in holding that the physical impairment test was inapplicable. No authority is cited in support of this contention nor is there any argument thereon contained in appellant's brief, therefore this assignment will not be discussed. State v. Coburn, 82 Idaho 437, 354 P.2d 751; Nash v. Meyer, 54 Idaho 283, 31 P.2d 273.

We do not agree with appellant's contention that the Board's findings of fact are not based on substantial competent evidence. In addition to the transcript of the testimony adduced at the hearing this record contains ninety-nine medical reports which have been furnished by the many doctors who have examined and cared for respondent, in addition to many x-ray films and other evidence. The procedural steps which the Board followed in reaching its conclusion is documented in thirty-seven transcript pages and it clearly appears therefrom that the Board carefully and exhaustively reviewed and considered the entire record. We are convinced that the findings, conclusions and award made by the Board were based upon substantial competent evidence and they are hereby affirmed.

Costs to respondent.

McFADDEN, TAYLOR and SMITH, JJ., and DUNLAP, D. J., concur.