649 P.2d 1197

**Harold HOUSER, Claimant-Appellant,**

v.

**SOUTHERN IDAHO PIPE & STEEL, INC., Employer, and United States Fidelity & Guaranty Company, surety, Defendants-Respondents.**

Nos. 13589, 14207.

Supreme Court of Idaho.

June 24, 1982.

Rehearing Denied Aug. 30, 1982.

Leslie T. McCarthy and Mary Linda Pearson, Lewiston, for claimant-appellant.

John W. Barrett, and Michael G. McPeek, of Moffatt, Thomas, Barrett & Blanton, Cht'd, Boise, for defendants-respondent.

McFADDEN, Justice.

By order of the court these two appeals were consolidated for argument and submitted on the same record, and were argued before the court at the same time.

No. 13589

Issues presented by the appeal of claimant attacking the Industrial Commission's order granting claimant an award of permanent partial disability in the amount of 10% loss of the leg at the hip will be discussed first.

On January 9, 1978, Mr. Harold Houser was an employee of Southern Idaho Pipe and Steel, Inc., earning $170.00 per week as a diesel mechanic. While working that day on a truck, Mr. Houser fell from the cab of the truck, injuring his left knee. Mr. Houser was subsequently seen by his family physician, Dr. Randall J. Slickers, of Twin Falls. When Mr. Houser's condition failed to improve as the result of Dr. Slicker's treatment, the doctor referred Mr. Houser to Dr. Michael Phillips, an orthopedic surgeon. Dr. Phillips subsequently performed a meniscectomy (surgical removal of torn cartilage from the knee joint). Since that time, Mr. Houser has been under the continuing care of Dr. Slickers.

Notice of the accident was given within sixty days to the employer. The employer had secured its liability under the Workmen's Compensation Act through United States Fidelity and Casualty Company. A dispute arose between Mr. Houser, his employer, and its surety concerning the extent of liability for Mr. Houser's injury. The parties being unable to reach an agreement, Mr. Houser filed an application for hearing with the Industrial Commission. A hearing was set for and subsequently held on August 7, 1979. The Commission determined that the issues before it were the period of Mr. Houser's total temporary disability and the nature and extent of Mr. Houser's permanent disability.

Dr. Slickers testified that traumatic arthritis is present in Mr. Houser's left knee, that Mr. Houser had undergone a prolonged recovery period, and, in his opinion, Mr. Houser will not be able to return to work in his usual occupation. Dr. Slickers made no statements as to whether further surgery is required.

Mr. Houser testified that his left knee has not quit hurting since the meniscectomy was performed. He observed that the knee joint has been degenerating rather than improving. Mr. Houser further testified that he is unable to stand any long length of time and that on occasion his knee "will go out from under him." In addition to his knee injury, Mr. Houser testified that he injured his back in falls in June and August

of 1978, which he believed had been caused by the buckling under of his knee. He stated that he had constant pain in his lower back area and could not sit for any prolonged period of time because of the pain. Mr. Houser also testified that he could not do sedentary work because his back injury prevented him from sitting long enough to do that type of work.

Mrs. Houser's testimony was corroborative of her husband's testimony.

At the hearing, medical reports of Dr. Phillips were entered into evidence. The reports indicated that Dr. Phillips could find nothing during his post-operative examination of Mr. Houser to justify additional surgical procedure or medical treatment. He discontinued Mr. Houser's physical therapy in October 1978. Dr. Phillips examined Mr. Houser again on January 29, 1979, at which time he deemed it appropriate to give Mr. Houser a permanent physical impairment rating. His report of the examination stated that Mr. Houser was going to work and rated Mr. Houser with a 10% permanent physical impairment of the lower extremity.

The Commission also allowed the hearing to be continued to obtain the testimony of Dr. Keith Taylor, an orthopedic surgeon, by deposition. Dr. Taylor had examined Mr. Houser at the request of the employer and its surety and subsequently ordered arthoscopy of the knee.[1] The arthoscopy was performed at St. Alphonsus Hospital in Boise in January 1979. As a result of the examination and arthoscopy, Dr. Taylor was unable to substantiate Mr. Houser's complaints of instability and pain in the knee, and that Mr. Houser should be able to return to employment. Dr. Taylor also rated Mr. Houser's permanent physical impairment at 10% compared to the loss of the leg at the hip.

With this testimony before it, as well as the medical reports and other evidence available to it, the Industrial Commission entered its findings of fact and conclusions

of law on December 19, 1979. The Commission found that Mr. Houser's condition was stable as of January 15, 1979, and that the employer and its surety had paid sums totaling $4,936.83 in disability benefits. The Commission further found that Mr. Houser only suffers a permanent partial disability of 10% of the loss of the leg at the hip as a result of the January 9, 1978, industrial accident. It also found that the record does not establish that further surgery on Mr. Houser's knee is reasonably required as a result of the accident, but that Mr. Houser will require elastic knee braces.

The Industrial Commission concluded as a matter of law that Mr. Houser had failed to establish by a preponderance of the evidence that he suffers a permanent disability in excess of 10% loss of the leg at the hip or that further surgery is necessary. It therefore ordered that Mr. Houser is entitled to total temporary disability benefits from the period commencing January 9, 1978, and ending January 15, 1979, that the employer and surety receive a credit in the amount of $4,936.83 against the sum due, that Mr. Houser receive an award of permanent partial disability in the amount of 10% of loss of the leg at the hip, and that the employer and surety pay the cost of all reasonable and necessary medical expenses for a reasonable period of time, including elastic knee braces, but that future surgical procedures have not been established as reasonably necessary.

In workmen's compensation cases, the court's review is limited to questions of law and determinations of whether the findings of fact of the Industrial Commission are supported by substantial, competent evidence. I.C. §§ 72–724(2) and 72–732(1); *Sykes v. C. P. Clare & Co.*, 100 Idaho 761, 605 P.2d 939 (1980); *Paulson v. Idaho Forest Industries, Inc.*, 99 Idaho 896, 591 P.2d 143 (1979); *Madron v. Green Giant Co.*, 94 Idaho 747, 497 P.2d 1048 (1972). If the findings of fact of the Industrial Commission are supported by substantial, compe-

---

1. Arthoscopy is an examination of the interior of a joint by use of an instrument known as an andoscope.

tent evidence, they will not be disturbed on appeal. *Dean v. Dravo Corp.*, 97 Idaho 158, 540 P.2d 1337 (1975); *Gradwohl v. J. R. Simplot Co.*, 96 Idaho 655, 531 P.2d 775 (1975). Claimant challenges the sufficiency of the evidence in this regard as to the Commission's findings of fact that he suffers only a permanent partial disability of 10% loss of the leg at the hip.

■ In the instant case, the Commission had before it the expert medical testimony of Dr. Taylor. Concerning Dr. Taylor's qualifications, he testified that as an orthopedic surgeon he had for a period of some eighteen years, on numerous occasions, evaluated patients for purposes of permanent impairment ratings as they pertain to industrial accident cases in this state. Dr. Taylor stated that, based on his examination of claimant and the results from the arthoscopy, claimant had a permanent physical impairment equivalent to 10% as compared to the loss of the leg at the hip. On the issue of whether claimant had reached a stable condition so that additional medical treatment would not be required, Dr. Taylor testified that in his opinion claimant's condition was stable. Regarding claimant's complaints of disabling pain, Dr. Taylor rendered the following opinion.

"A. Again, these are subjective complaints and you have to base your opinions and findings on subsequent subjective findings on examination and that's—to aid your conclusions. And these are not objective findings, they are subjective complaints.

Q. Well, do you take the stand, then, if you have a subjective complaint and a person says that I am suffering pain, that you do not give this subjective finding validity?

A. Not if they are—if there's a lack of any significant subjective findings to back it up."

. . . .

Q. And, Doctor, that being the case, do you know of any medical reason why the leg would give out, the knee would give out each day due to instability; can you explain that medically?

A. You mean in this individual?

Q. Yes.

A. No.

Q. And, Doctor, insofar as your examination and subsequent hospitalization and procedure is concerned, from a medical viewpoint, can you substantiate this man's complaints of pain as related to you by Mr. McCarthy?

A. No."

Finally, on the issue of whether claimant could engage in gainful employment and/or return to his former vocation. Dr. Taylor stated his opinion as follows:

"Q. Doctor, as I understand it, the claimant at the time of this accident, and he does have experience as a heavy equipment mechanic, a diesel mechanic, doing mechanical work on vehicles and heavy equipment; this is basically what the man has done for a large portion, at least, of his lifetime, doing maintenance work and diesel mechanic work, he had done this for a period of some thirteen years. Doctor, are you aware of, generally, what is required of a heavy equipment and diesel mechanic?

A. Yes.

Q. You have observed and seen, from time to time, heavy construction equipment, large trucks, this sort of thing?

A. Yes.

Q. From a medical standpoint, is there any reason that you know of why the claimant could not engage in that type of gainful employment?

A. No."

Admittedly, the testimony of Dr. Slickers, as summarized earlier, is at variance with the professional opinions of Dr. Taylor. Nonetheless, the testimony of Dr. Taylor as detailed above constitutes substantial competent evidence supporting the Commission's findings of fact that claimant suffers a permanent partial disability of 10% loss of the leg at the hip. *Sykes v. C. P. Clare & Co., supra; Thom v. Callahan*, 97 Idaho 151, 540 P.2d 1330 (1975).

The claimant next asserts that the Commission failed to fulfill its duty to consider

both medical and nonmedical factors in its evaluation of claimant's permanent disability. As to this assertion, claimant directs the court's attention to I.C. § 72–422, which states in part, "[p]ermanent impairment is a basic consideration in the evaluation of permanent disability, and is a contributing factor to, but not necessarily an indication of, the entire extent of permanent disability." *See* I.C. § 72–425. Consistent with I.C. §§ 72–422 and 72–425, claimant also directs the court's attention to the statement in *Lyons v. Industrial Special Indemnity Fund*, 98 Idaho 403, 406, 565 P.2d 1360, 1363 (1977), that "[i]n addition to the medical factors of permanent impairment, the Commission must also consider nonmedical factors such as age, sex, economic and social environment, training and usable skills." *See also, Murray v. Hecla Min. Co.*, 98 Idaho 688, 571 P.2d 334 (1977); *Francis v. Amalgamated Sugar Co.*, 98 Idaho 407, 565 P.2d 1364 (1977).

■  The position advanced by claimant appears to be that whenever a permanent physical impairment rating is given, the disability rating in all cases must exceed the permanent physical impairment rating by taking into consideration the various nonmedical factors outlined under the workmen's compensation law. The problem facing claimant is that there is no such evidence in the record bearing on any disability above and beyond the physical impairment rating.

■  Finally, claimant asserts that the Commission erred in its conclusion of law that claimant had failed to establish by a preponderance of the evidence that he suffers a permanent disability in excess of 10% loss of the leg at the hip. In this light, claimant's argument appears to boil down to the fact that a greater number of witnesses supported a view different from the conclusion reached by the Commission. The fact that a greater number of witnesses supported a view different from the conclusion reached is of no moment in determining the preponderance of the evidence. *Arnold v. Splendid Bakery*, 88 Idaho 455, 401 P.2d 271 (1965). Rather, the determination must be based on an assessment of the reliability, trustworthiness, and probative value of the evidence. As such, the determination is in the first instance a question of fact committed to the particular expertise of the Commission; and its determination as to the weight and credibility of the testimony is conclusive on appeal unless it appears to be clearly erroneous. *Arnold v. Splendid Bakery, supra.* Claimant has failed to make such a showing, and therefore, it cannot be said that the Commission erred in its conclusion that claimant had failed to meet his burden of proof.

### No. 14207

Issues raised by the appeal of claimant challenging the Industrial Commission's order denying his subsequent application for a hearing will next be discussed.

During the pendency of the appeal in no. 13589, in late November 1980, claimant filed an application for a hearing with the Industrial Commission, alleging an injury to his back in August of 1978 was the direct result of the knee injury he sustained in January of 1978 while in the employ of Southern Idaho Pipe and Steel, Inc. The employer and its surety duly filed an answer to the application. The answer included a motion to dismiss on the ground that the compensability of claimant's back injury had already been decided by the Commission in the prior hearing.

Oral argument on the motion to dismiss was heard February 25, 1981, before referee Robert C. Youngstrom. The referee thereafter submitted to the Commission his report and recommendation that an order be entered dismissing the application for hearing, reasoning that:

"The difficulty which the claimant encounters in his present case is that he has previously litigated this issue. An examination of the transcript of proceedings, which is now on appeal to the Supreme Court, shows that the claimant testified, at length, about his back injury and his back condition which he contended was caused by a fall due to his unstable left knee. The Commission heard this evi-

dence and then entered a decision awarding the claimant certain workmen's compensation benefits for the consequences of his injury. This is the matter which is now on appeal . . . .

. . . .

Under the doctrine of *res judicata* a judgment on the merits, in a prior action, bars a second action involving the same parties based on the same cause of action. Where a second action is brought upon a different cause of action, the doctrine of collateral estoppel precludes relitigation of issues actually litigated and necessary to the outcome of the first action. The Referee concludes that, because the claimant litigated his alleged back injury in the prior action, which is now on appeal to the Supreme Court, he is precluded from relitigating the matter in the present action before the Commission."

Upon review of the referee's report and recommendation, on April 27, 1981, the Industrial Commission ordered that the application for hearing be dismissed. We affirm.

Under the doctrine of *res judicata*, a judgment on the merits in a prior proceeding bars a subsequent lawsuit between the same parties upon the same cause of action. *Ramseyer v. Ramseyer*, 98 Idaho 554, 569 P.2d 358 (1977); *Joyce v. Murphy Land & Irrig. Co.*, 35 Idaho 549, 208 P. 241 (1922). The "sameness" of a cause of action for purposes of application of the doctrine of *res judicata* is determined by examining the operative facts underlying the two lawsuits. Restatement (Second) of Judgments, § 61, Comment a (Tent.Draft no. 1 1973).

In the prior proceeding, the claimant sought workmen's compensation benefits for total and permanent disability on the basis of the knee injury sustained in the industrial accident on January 9, 1978 and back injuries allegedly sustained in falls in June and August 1978, which were said to have been occasioned by the instability of his injured knee. Claimant testified at length about these alleged back injuries and their effects on his physical condition and his ability to be employed. In claimant's

subsequent application for hearing in the instant case, he sought additional compensation for back injuries allegedly sustained in a fall in August 1978, which was allegedly occasioned by the instability of claimant's previously injured knee. This is the same incident which formed the basis for claimant's claim of total and permanent disability in the prior proceeding. In sum, the proceeding in the instant case and in the prior proceeding arose out of the same operative facts between the same parties. The Commission properly dismissed the application for hearing on the basis of the doctrine of *res judicata*. Given this conclusion, the applicability of the doctrine of collateral estoppel need not be discussed.

The order of the Industrial Commission granting claimant an award of permanent partial disability is affirmed. The order of the Industrial Commission dismissing claimant's subsequent application for a hearing is affirmed. Costs to respondents.

BAKES, C. J., and DONALDSON and SHEPARD, JJ., concur.

BISTLINE, Justice, concurring and dissenting.

I.

Assuming the validity of the Court's disposition of No. 13589, I then join that portion of the Court's opinion which disposes of No. 14207 on grounds of res judicata. At the same time, however, because a reversal of No. 13589 would appear to provide this unfortunate claimant with a brand new format wherein he could litigate the issues belatedly raised in No. 14207, I commend to the Court's attention that it is highly imperative that the Court be entirely correct in affirming No. 13589—otherwise the claimant is left with very little other than the possibility of seeking to re-open based on change of condition or because of manifest injustice. Although the claimant's brief in No. 13589 is thoroughly prepared with ample reference to this Court's controlling decisions, *Dean v. Dravo Corporation*, 97 Idaho 158, 540 P.2d 1337 (1975); *Paull v. Pre-*

ston Theatres Corporation, 63 Idaho 594, 124 P.2d 562 (1942); Dunn v. Baugh, 95 Idaho 236, 506 P.2d 463 (1973); Pierstorff v. Gray's Auto Shop, 58 Idaho 438, 74 P.2d 171 (1937); Dean v. Dravo Corporation, 95 Idaho 558, 511 P.2d 1334 (1973); Hite v. Kulhenak Building Contractor, 96 Idaho 70, 524 P.2d 531 (1974); Murray v. Hecla Mining Company, 98 Idaho 688, 571 P.2d 334 (1977); Lyons v. Industrial Special Indemnity Fund, 98 Idaho 403, 565 P.2d 1360 (1977); Francis v. Amalgamated Sugar Company, 98 Idaho 407, 565 P.2d 1364 (1977); Madariaga v. Delamer Milling Corporation, 64 Idaho 660, 135 P.2d 438 (1943); Stroscheim v. Shay, 63 Idaho 360, 120 P.2d 267 (1941); Kern v. Shark, 94 Idaho 69, 480 P.2d 915 (1971); Steinebach v. Hoff Lumber Company, 98 Idaho 428, 566 P.2d 377 (1977), and to statutory provisions of the Workmen's Compensation Law, I.C. §§ 72–724, –732, –425, –423, –424, –422, being the same order in which they appear in the brief, presentation of oral argument in this Court and the general course of the claimant's trial representation leave a strong suggestion that this case resembles the recent case of Sines v. Appel, 103 Idaho 9, 644 P.2d 331 (1982). Ignoring all of that, however, but, with close regard for the appeal record and the brief of both parties, I am far from persuaded that the Court today correctly turns the claimant away in No. 13589, to which I now turn.

## II.

### A.

Initially I note that the employer-surety places great reliance on Sykes v. C. P. Clare & Co., 100 Idaho 761, 605 P.2d 939 (1980), and they register mild bewilderment that claimant makes no mention of that case. I would assume that claimant's counsel either saw that case as not in point, or if in point, not persuasive for reasons pointed out in the dissenting opinion of Bistline, J. A resolution of that inquiry is unnecessary to a proper determination of this claimant's appeal, the point of law involved herein being considerably dissimilar.

### B.

I.C. § 72–425 provides that the evaluation of permanent disability "is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment and by nonmedical factors, such as age, sex, education, economic and social environment." As the Court noted in Lyons v. Industrial Special Indemnity Fund, 98 Idaho 403, 565 P.2d 1360 (1977), this Court held that "[i]n addition to the medical factor of permanent impairment, the Commission must also consider nonmedical factors such as age, sex, education, economic and social environment, training and usable skills.". Id. at 406, 565 P.2d at 1363.

In this case the claimant argues that the Commission failed to comply with its duty under I.C. § 72–425 to consider both medical and nonmedical factors in its evaluation of claimant's permanent disability. From this the Court concludes, "The position advanced by claimant appears to be that whenever a permanent physical impairment rating is given, the disability rating in all cases must exceed the permanent physical impairment rating by taking into consideration the various nonmedical factors outlined under the workmen's compensation law." The Court then dismisses the claimant's argument because "there is no such evidence in the record bearing on any disability above and beyond the physical impairment rating." I cannot agree with the Court's conclusion that there is no evidence in the record which would justify the disability rating above the physical impairment rating. Nor can I agree with the Court's characterization of the claimant's argument.

### C.

Although the Court concludes that there is no evidence in the record which would justify a disability rating above the physical impairment rating, even a brief examination of the record demonstrates that there is a considerable amount of evidence in the record that would justify such a finding.

The record shows that the claimant began working when he was twelve or thirteen years old and that he has been employed chiefly as a mechanic since that time. It reveals that Mr. Houser had an eighth grade education and that Mr. Houser was concerned with his general lack of education. The record also reveals that Mr. Houser was given various tests for skills and abilities by Opportunities Unlimited, Inc., and that the results were as follows:

"In the Peabody Individual Achievement Test, Mr. Houser scored in the fourth grade, fourth month in mathematics, or at the 5th percentile, when compared with adults. In reading recognition, Mr. Houser scored at the sixth grade, sixth month, or 8th percentile; whereas in reading comprehension, Mr. Houser scored in the ninth grade, second month, or 25th percentile. In spelling, Mr. Houser scored in the eighth grade, fourth month, or 12th percentile, and in general information, Mr. Houser scored in the eleventh grade, fifth month, or 37th percentile. *The total test score indicated Mr. Houser scoring at the eighth grade, or 11th percentile, when compared with an adult population.* When compared with academic high school seniors, Mr. Houser scored at the 45th percentile in the Bennett Mechanical Comprehension Test. Mr. Houser scored at the 5th percentile on the Differential Aptitude Test (space relations), when compared with high school seniors. The Revised Minnesota Paper Form Board Test indicated that Mr. Houser scored at the 15th percentile, when compared to applicants for electrical and mechanical and maintenance work.

"In physical aspects, Mr. Houser scored in the 5th percentile in the Minnesota Rate of Manipulation Test. Mr. Houser was unable to complete the VALPAR Small Tools (mechanical) section, owing to pain in his lower back. In the VALPAR Whole-Body Range of Motion, Mr. Houser scored in the 80th percentile, indicating some pain in his left knee, as well as

pain in the lower-back region. In the VALPAR Eye-Hand-Foot Coordination, Mr. Houser scored at the 84th percentile."

The record is replete with testimony of the claimant and his wife that he is in continual pain as a result of the knee injury. Although Dr. Taylor, the orthopedist who performed claimant's knee surgery, stated that from a medical viewpoint he could find nothing [1] to substantiate the claimant's complaints of pain, Dr. Slickers, the physician who has been seeing Mr. Houser regularly since the surgery, testified:

"We do have some indicators that the knee isn't right. He has some arthritic changes, he, occasionally gets effusion and he definitely has a lot of pain to the point he can no longer perform his previous tasks. We may not say this equals the pain, but, none the less, there is evidence, there's pathology, maybe not to the point that it is affecting him but I can't judge that. You don't have a thermometer to stick in there and measure pain."

The record also contains testimony by Dr. Slickers that Mr. Houser was unable to return to his former line of work due to the pain and swelling in his knee. The testimony of Dr. Taylor does not contradict that of Dr. Slickers. Dr. Taylor merely stated that there was no reason of which he knew why the claimant could not engage in work as a diesel mechanic. In addition he stated, "I do not feel that [the claimant] has sufficient finding on examination of his knee that would be a limiting factor to him to prevent him from returning to ordinary gainful employment."

The record also contains testimony by the claimant to the effect that he injured his back as a result of his knee giving out and that he has been in pain as a result of that injury since the injury occurred. Dr. Taylor testified that Mr. Houser's knee was not unstable as a result of the injury and the resulting surgery. Dr. Taylor also testified that he did not consider claimant's back

1. See Appendix.

injury in the impairment rating. However, the fact of this subsequent injury, like the facts discussed above, was certainly "evidence" in the record which might have justified a disability rating in excess of the impairment rating for claimant's knee.

### D.

The Court misconstrues the claimant's argument when it states that "[t]he position advanced by claimant appears to be that whenever a permanent physical impairment rating is given, the disability rating in all cases must exceed the permanent physical impairment rating by taking into consideration the various nonmedical factors outlined under the workmen's compensation law." I believe that the claimant's contention is that *in this case* the Commission did not give proper consideration to the nonmedical factors in its evaluation of his total disability. The record appears to support the claimant's contention.

In its Findings of Fact, under part II (Employee Status & Wages), the Commission states:

> "On January 1, 1978, claimant was employed by defendant Southern Idaho Pipe & Steel, Inc., and was earning $170.00 per week as a diesel mechanic. On January 9, 1978, claimant (born July 9, 1944) was a married man with two minor children, whose dates of birth are July 3, 1978, and July 29, 1967.
>
> "Since he was thirteen years old, claimant's major experience has been as a diesel mechanic."

Under part V (Permanent Partial Disability) the Commission reviews the medical testimony that was presented and finds, "based on conflicting evidence, that as a result of an industrial accident sustained by claimant on January 9, 1978, claimant suffers a permanent partial disability of 10% loss of the leg at the hip." Despite the clear mandate of the legislature and of this Court, nowhere in this section of the Findings of Fact does there appear to be any consideration of nonmedical factors, such as age, sex, education, economic and social environment. In fact, the language of the Commission's findings suggests that only the "conflicting" medical testimony was considered in this case.

It would not be appropriate to presume that Dr. Taylor considered nonmedical factors in evaluating Houser's permanent physical impairment. The evaluation of permanent physical impairment is governed by I.C. § 72–424, which provides: " 'Evaluation (rating) of permanent impairment' is a medical appraisal of the nature and extent of the injury or disease as it affects an injured employee's personal efficiency in the activities of daily living, such as self-care, communication, normal living postures, ambulation, elevation, traveling, and nonspecialized activities of bodily members." The evaluation of permanent physical impairment therefore should not involve consideration of nonmedical factors such as age, sex, education, and economic and social environment. In this case, Dr. Taylor's testimony indicates that the nonmedical factors were not considered in his evaluation of Houser's permanent physical impairment.

The Commission must follow the guidelines established by the legislature in determining a claimant's total disability. I.C. § 72–422 specifically states that permanent physical impairment "is a basic consideration in the evaluation of permanent disability, and is a contributing factor to, *but not necessarily an indication of*, the entire extent of permanent disability." (Emphasis added.) I.C. § 72–425 states that the evaluation of permanent disability "is an appraisal of the injured employee's present and probable future ability to engage in gainful activity as it is affected by the medical factor of permanent impairment *and by nonmedical factors such as age, sex, education, economic and social environment*." (Emphasis added.)

As a general rule, I believe it would be inappropriate to presume that the Commission considered the factors found in I.C. § 72–425 where no such consideration of the factors appears in the record. There is no way for a claimant who is denied compensation, or for this Court in reviewing on appeal such a denial, to on a bare record

determine whether or not the Commission has complied with its statutory duty. It is especially inappropriate to presume in this case that the Commission considered nonmedical factors, since the language in its Findings of Fact is that only the "conflicting" medical evidence was considered. The Court side-steps this whole issue by casually stating that there is no evidence in the record which would support a disability rating above the physical impairment rating. Even the briefest review of the record, however, demonstrates that this simply is not the case. Since there is no indication that the Commission considered nonmedical factors in determining claimant's disability rating, there should be a reversal of the Commission's order, with directions that on remand it reconsider and restate its findings delineating therein the application of the above-mentioned statutory law to claimant's medical condition.

### APPENDIX

Dr. Taylor's negative testimony was, as pointed out in the Court's opinion, predicated upon the peculiar stance that he simply does not honor anyone's "subjective" complaint that he is suffering pain. This seems strange indeed when thousands of practitioners throughout the country routinely hear subjective complaints of pain and prescribe various medicines which hopefully will provide the paying patients with relief. In essence, Dr. Taylor, who does not accept as valid complaints of pain which cannot be objectively substantiated, states only that he is unable to come up with any objective findings which substantiate claimant's recurring pain. This would undoubtedly be true in countless thousands of cases, but how much worth should such negative testimony be given, and especially when it is always available? The answer is found in *Beaver v. Morrison-Knudsen Co.*, 55 Idaho 275, 289, 41 P.2d 605, 610, where the Court stated, as is generally the law: "Positive expert testimony will prevail over negative expert testimony." To which may be added for a long time this Court has adhered to the rule that in a case like this, where Dr. Taylor's testimony was not taken before the Commission, the Court is in as good a position to evaluate its weight and credibility as was the Commission—both reading only a cold record. Today's decision by the Court lends much strength to the wisdom of that rule. Another rule which certainly has some applicability here is that which allows less credence to the testimony of an examining physician as against that of the treating physician. Dr. Taylor conceded that he made the one examination of claimant solely for the purpose of furnishing a report to the surety.

Dr. Taylor's examining expert stance included a staunch refusal to give any consideration to the claimant's history as related by claimant, and an apparent disinclination to make any attempt at independent corroboration. For instance, these indicative excerpts:

"Q. And if an individual has what we would call a low tolerance for pain, in other words, they can't accommodate the pain or get along with the pain, that would be more disabling to a person who had a high tolerance for pain and could stand a lot of it; is that right?

A. Well, I would—I dislike using the word 'disabling.' I think it's an interpretative thing. And I think people that have pain can still, you know, they can still function satisfactorily and adapt to their conditions.

Q. Dr. Slickers stated that in his opinion this matter of Mr. Houser's was now chronic. Would you agree with that?

A. I think I would use the term 'stable.'

Q. Stable or chronic. What's the difference between—

A. I would use the term 'stable.' Dr. Slickers can use whatever term he wants.

Q. Would Dr. Slickers be correct if he said in his opinion it would be chronic?

A. I would not venture an opinion as to what Dr. Slickers' conclusions are.

. . . .

Q. Did you check this man as to his sleeping habits?

A. I didn't sleep with him, but I do have some comment on my physical as to what . . .

Q. What do you have in your notes?

MR. BARRETT: As to what the man told him about his sleeping?

MR. McCARTHY: Right.

WITNESS: I have no notation here about sleeping habits.

BY MR. McCARTHY:

Q. Well, if it was brought out in the testimony that since the date of this injury to the present time that either he had either slept on the floor in their home or in a special davenport that they have acquired and he has not slept with his wife one night since this injury because of his inability to sleep, would that, in any way, change your opinion?

A. Not at this point. I would certainly have to have a lot more information available and would be very suspicious of complaints like that, you know, any reference to a knee injury.

Q. Well, the man says that his knee pains him continually and he is unable to sleep because of pain.

A. Again, these are subjective complaints and you have to base your opinions and findings on subsequent subjective findings on examination and that's—to aid your conclusions. And these are not objective findings, they are subjective complaints.

Q. Well, do you take the stand, then, if you have a subjective complaint and a person says that I am suffering pain, that you do not give this subjective finding validity?

A. Not if they are—if there's a lack of any significant subjective findings to back it up.

Q. Dr., in examining a patient, a large part of the examination is the subjective aspect of the matter, is it not?

A. You are talking about the examination or the history?

Q. The history. Isn't that very, very important?

A. The history is important, yes.

Q. And without the history, if you couldn't obtain a history, you would be in a difficult position to make a conclusion; would you not?

MR. BARRETT: May I, for clarification, when you talk about history, this includes a lot of things besides subjective complaints of pain. Are you referring to history of pain or complete history?

MR. McCARTHY: History of pain, right.

WITNESS: It's an aid in coming to your conclusion, yes.

BY MR. McCARTHY:

Q. And did you give Mr. Houser any tests for pain?

A. Any tests for pain?

Q. Yes.

A. On examining his knee, yes. You certainly see what the motion is and check his muscles and ligaments and see what his reactions are to the examination as to whether he has pain during the examination and whether he has discomfort in certain positions or with certain motions of the knee as you are rotating it through various ranges of motions.

Q. All right. Did he demonstrate or evidence to you any pain?

A. Yes.

Q. Yes, he did. And where, in the point of the examination, was the pain demonstrated?

A. When you moved his knee out into extension, straightening it out, he described discomfort through the knee and posterially in the knee.

Q. Did he describe it? Could you tell by looking at him that he was suffering pain, experiencing pain?

A. No.

Q. You didn't look at him for that, you were waiting for him to tell you?

A. You look at him and he says it's uncomfortable. He wasn't crying, no.

Q. Would it be necessary for a person to cry to demonstrate to you sufficient pain to make it disabling?

A. No, it's not necessary for him to cry.

Q. Well, when you said he wasn't crying, what did he tell you about his pain at that time, then?

A. He just said it was uncomfortable, has a discomfort in his knee when it would move in certain positions.

Q. It would hurt?

A. It's uncomfortable.

Q. It was uncomfortable. Could he straighten out his knee?

A. He lacked—let's see—about five degrees of full extension of getting it out straight.

Q. And how much function was there in the knee as you observed?

A. He had nearly full range of motion. He lacked about twenty degrees of full flexion and five degrees of extension. He had no swelling of the knee. He had good ligament stability. He had very slight crepitus in the kneecap as he would move it throughout a range of motion. He had no significant muscle atrophy, or wasting of the muscles about the knee. These are all findings for a functional knee.

Q. But pain, as you stated, is not an objective finding?

A. No.

Q. And the only tests that you gave him for pain was manipulation of the knee?

A. And examination of the knee.

Q. None other?

A. I'm not sure there's any other way to evaluate pain in the knee, other than on examination of the knee.

Q. Now, if the man testified because of pain in his knee, he's unable to sleep, would that be of significance to you?

A. Well, certainly, it's part of the history that you would evaluate, much like he has pain in his knee when he kneels or squats or whether he walks up and down any hill or up and down stairs. It's one small facet, yes.

Q. And that the pain was present when he was not doing any of these other things that you mentioned and it's a constant pain?

MR. BARRETT: Is that a question?

MR. McCARTHY: Yes.

BY MR. McCARTHY:

Q. I want your opinion there. If it's a constant pain day and night.

A. He didn't tell me—he did not relate that it was a constant pain on my history.

Q. Did you ask him?

A. I asked him when he had pain and he stated that he had pain in those conditions that I previously described. But he did not relate that it was a constant pain.

Q. It was always burning; wasn't it?

A. Not always burning, just burning.

Q. Well, Dr. Slickers related that this pain was of a constant nature, based on his history, and is presently treating Mr. Houser for the same thing that you examined him for. Would that, in any way, change your opinion?

A. No. I would have to hear that from the patient, not from Dr. Slickers. I can't rely on somebody else's history. I would have to have a history of my own.

Q. Perhaps, your history, then, isn't complete; is that correct?

A. Are you inferring that or saying that?

Q. I'm asking you, is your history complete?

A. It's complete as far as I was concerned, yes.

Q. As far as you were concerned, on one examination?

A. Yes."